# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: June 18, 2019

| | | |
|---|---|---|
| * * * * * * * * * * * * * | | |
| JESSICA HARDING, | * | UNPUBLISHED |
| | * | |
| Petitioner, | * | No. 17-1580V |
| | * | |
| v. | * | Special Master Gowen |
| | * | |
| SECRETARY OF HEALTH | * | Attorneys' Fees and Costs; |
| AND HUMAN SERVICES, | * | Respondent's Objection to |
| | * | Reasonable Basis; Significant |
| Respondent. | * | Aggravation. |
| * * * * * * * * * * * * * | | |

<u>Mark T. Sadaka</u>, Mark T. Sadaka, LLC, Englewood, NJ, for petitioner.
<u>Voris E. Johnson</u>, United States Department of Justice, Washington, DC for respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

On February 28, 2019, Jessica Harding ("petitioner") filed a motion for attorneys' fees and costs. Petitioner's Motion for Attorney Fees ("Pet. Fees App.") (ECF No. 25). For the reasons discussed below, I hereby **GRANT** the motion and award a total of $17,366.96 in attorneys' fees and costs.

## I.   Procedural History

On October 20, 2017, Jessica Harding ("petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program.[2] Petition (ECF No. 1). Petitioner claimed that she suffered the significant aggravation of granulomatosis with polyangiitis ("GPA") (formerly termed Wegener's granulomatosis) as a result of Gardasil (human papillomavirus, or "HPV")

---

[1] Pursuant to the E-Government Act of 2002, see 44 U.S.C. § 3501 note (2012), **because this opinion contains a reasoned explanation for the action in this case, I intend to post it on the website of the United States Court of Federal Claims.** The Court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. Before the opinion is posted on the Court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). An objecting party must provide the Court with a proposed redacted version of the opinion. Id. **If neither party files a motion for redaction within 14 days, the opinion will be posted on the Court's website without any changes.** Id.

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 <u>et seq.</u> (hereinafter "Vaccine Act" or "the Act"). Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

vaccinations that she received on October 28, 2014, November 25, 2014, and February 25, 2015. Petition (ECF No. 1).

In the petition, petitioner associated the first potential signs of GPA with a previous three-dose course of the same HPV vaccinations received on April 2, 2009; January 28, 2010; and July 26, 2010. *Id.* at ¶ 3. Petitioner was barred from claiming that those earlier HPV vaccinations were the cause-in-fact of her GPA because those vaccines and the original onset of symptoms were well outside of the statute of limitations set forth by the Vaccine Act. §16(a)(2).

On October 26, 2017, petitioner filed 13 exhibits of medical records. Exhibits ("Exs.") 1-13 (ECF Nos. 6-7). Petitioner was ordered to file any remaining medical records and a Statement of Completion within six weeks of the petition, by December 1, 2017. Order (Non-PDF) entered on November 6, 2017. Petitioner requested and received a first extension of time until January 30, 2018. Motion ("Mot.") (ECF No. 8); Order (ECF No. 9). On that deadline, she requested and received a second extension of time until March 30, 2018. Mot. (ECF No. 10); Order (ECF No. 11). In February 2018, petitioner filed two additional exhibits containing additional medical records. Pet. Ex. 14 (ECF No. 12); Pet. Ex. 15-16 (ECF No. 13). However, the record was not complete. She requested a third extension of time which was granted in part and amended her deadline to May 14, 2018. Mot. (ECF No. 14); Order (ECF No. 15). She then requested and received a fourth extension of time until June 13, 2018. Mot. (ECF No. 16); Order (Non-PDF) entered on May 15, 2018.

By that deadline, petitioner did not file any additional medical records or a Statement of Completion. Rather, she filed a status report which provided: "Petitioner has indicated to her counsel that she wishes to discontinue her case. Petitioner's counsel respectfully requests thirty (30) days or until July 13, 2018, to file a motion for a decision in this case." Status Report (ECF No. 17). The request was granted. Order (Non-PDF) entered on June 14, 2018. Petitioner did not file for the dismissal of her claim. Instead, on July 13, 2018, petitioner's counsel requested a status conference to discuss next steps. Status Report (ECF No. 19).

On July 19, 2018, I convened a status conference as requested. Petitioner's counsel stated that petitioner had verbally indicated that she wished to discontinue her claim in the Vaccine Program. However, petitioner has been unwilling or unable to send written authorization to her counsel. Petitioner's counsel stated that her job involves travel, but he believed that she had returned home to Las Vegas and that did not fully account for the delay. I agreed that petitioner's counsel needed her cooperation to either discontinue or continue with her claim. Accordingly, on July 19, 2018, I ordered petitioner to file all remaining medical records and a statement of completion or deliver to counsel her written authorization to discontinue her claim by August 20, 2018. Order to Show Cause (ECF No. 20). On August 20, 2018, petitioner duly filed an unopposed motion for a decision dismissing her claim. Mot. (ECF No. 21). I issued a decision granting petitioner's motion and dismissing her claim for insufficient proof on August 20, 2018. Decision (ECF No. 22). Judgment entered on September 21, 2018. Judgment (ECF No. 24).

On February 28, 2019, petitioner filed the instant motion for attorneys' fees and costs. Pet. Fees App. (ECF No. 25). She requested attorneys' fees in the amount of $15,838.84 and

attorneys' costs in the amount of $1,528.12, for a total attorneys' fees and cost request of $17,366.96. Pet. Fee App., Ex. A at 10-11.[3]

On March 8, 2019, respondent filed a response, in which he opposes the motion for attorneys' fees and costs on the grounds that petitioner has failed to establish reasonable basis for her claim and therefore is not entitled to receive an award of attorneys' fees and costs under the Vaccine Act. Respondent's ("Resp.") Response (ECF No. 26) at 1, citing § 15(e)(1).

On March 12, 2019, petitioner filed a reply arguing that there was reasonable basis for her claim and that she should receive reasonable attorneys' fees and costs. Pet. Reply (ECF No. 27). On June 17, 2019, petitioner filed a signed statement warranting that she has not personally incurred any fees or costs related to the prosecution of this petition. General Order No. 9 Statement (ECF No. 29). This matter is now ripe for adjudication.

## II.     Entitlement to Attorneys' Fees and Costs

### A.  Legal Standard

The Vaccine Act provides that reasonable attorney's fees and costs "shall be awarded" for a petition that results in compensation. § 15(e)(1)(A)-(B). Even when compensation is not awarded, reasonable attorneys' fees and costs "may" be awarded "if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for which the claim was brought." § 15(e)(1). The Federal Circuit has reasoned that in formulating this standard, Congress intended "to ensure that vaccine injury claimants have readily available a competent bar to prosecute their claims." *Cloer v. Sec'y of Health & Human Servs.*, 675 F.3d 1358, 1362 (Fed. Cir. 2012).

"Good faith" and "reasonable basis" are two distinct requirements. *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017) (citing *Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 289 (2014)). "Good faith" is a subjective standard. *Id.*

In contrast to good faith, "reasonable basis" is an objective consideration of the totality of the circumstances except for the statute of limitations or any directly related conduct by petitioner's counsel. *Simmons*, 875 F.3d at 635; *Chuisano*, 116 Fed. Cl. at 289. However, this evaluation may include various objective factors such as "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289-90 (2018). "[I]n deciding reasonable basis the Special Master needs to focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery." *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Jan. 5, 2018). A petitioner must furnish some evidence in support of the claim. *Bekiaris v. Sec'y of Health & Human Servs.*, 140 Fed. Cl. 108, 115 (2018) (reasoning that the petitioner must

---

[3] The application for attorneys' fees and costs incorrectly asserts that petitioner's request is for $**2**7,366.96. Pet. Fee App. at 4 (emphasis added). The emphasized digit "2" was most likely an inadvertent error, as the underlying documentation shows that the requested fees and costs total $**1**7,366.96. Pet. Fees App., Ex. A at 10-11.

"adduce medical evidence going to causation beyond temporal proximity").  For example, in *Chuisano*, the Court of Federal Claims held that a petitioner's statement plus temporal proximity was insufficient.  The Court suggested that additional sources of support would include medical records mentioning the vaccination; treating physicians' attribution of the injury to the vaccination; and expert opinion.  *Chuisano*, 116 Fed. Cl. at 290.

Reasonable basis may exist at the time a claim is filed but dissipate as the case progresses.  *R.K. v. Sec'y of Health & Human Servs.*, 760 Fed. Appx. 1010, 1012 (Fed. Cir. March 15, 2019) (citing *Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375, 1376-77 (Fed. Cir. 1994) for the holding that "an award of fees and costs was not authorized for work performed on a case after a claim lost its reasonable basis").  "Petitioners' counsel have an obligation to voluntarily dismiss a Vaccine Act claim once counsel knows or should know a claim cannot be proven."  *Cottingham v. Sec'y of Health & Human Servs.*, 134 Fed. Cl. 567, 574 (2017) (citing *Perreira*, 33 F.3d at 1376; *Curran v. Sec'y of Health & Human Servs.*, 130 Fed. Cl. 1, 6 (2017); *Allicock v. Sec'y of Health & Human Servs.*, 128 Fed. Cl. 724, 727 (2016)).

## B.  Application

### 1. Granulomatosis with Polyangiitis (GPA)

The parties did not retain experts or offer their own definitions of the disease at issue, granulomatosis with polyangiitis ("GPA") (formerly termed Wegener's granulomatosis).  The Mayo Clinic provides that it is one of a group of blood vessel disorders called vasculitis.  GPA specifically "causes inflammation of the blood vessels in your nose, sinuses, throat, lungs, and kidneys."[4]  "Signs and symptoms… can develop suddenly or over several months."  *Id.*  The signs and symptoms might include: "pus-like drainage with crusts from your nose, stuffiness, sinus infections and nosebleeds; coughing, sometimes with bloody phlegm, shortness of breath or wheezing; fever; fatigue; joint pain; numbness in your limbs, fingers, or toes; weight loss; blood in your urine; skin sores, bruising, or rashes; eye redness, burning or pain, and vision problems; [and] ear inflammation and hearing problems."  *Id.*  "Early diagnosis and treatment of GPA might lead to a full recovery.  Without treatment, the condition can be fatal."  *Id.*

GPA has been previously recognized to be an autoimmune disease.  *See, e.g.*, *Purvis v. Sec'y of Health & Human Servs.*, No. 14-1025V, 2017 WL 4001683, *2 (Fed. Cl. Spec. Mstr. Aug. 18, 2017).  There have been certain awards of compensation for claims that GPA was either caused or significantly aggravated by various vaccines.  *See, e.g.*, *Rosa v. Sec'y of Health & Human Servs.*, No. 14-886V, 2017 WL 1401365 (Fed. Cl. Spec. Mstr. Mar. 24, 2017); *Purgason v. Sec'y of Health & Human Servs.*, No. 12-465V, 2016 WL 1627575 (Fed. Cl. Spec. Mstr. April 4, 2016); *Fields v. Sec'y of Health & Human Servs.*, No. 02-311V, 2008 WL 222241 (Fed. Cl. Spec. Mstr. May 14, 2008); *Schrum v. Sec'y of Health & Human Servs.*, No. 04-210V, 2006 WL 1073012 (Fed. Cl. Spec. Mstr. Mar. 31, 2006).  However, the Court did not locate past awards for this condition following HPV vaccinations.

---

[4] Mayo Clinic, *Granulomatosis with Polyangiitis*, https://www.mayoclinic.org/diseases-conditions/granulomatosis-with-polyangiitis/symptoms-causes/syc-20351088.

### 2. Onset in Relation to the (Time-Barred) First Set of HPV Vaccines

Petitioner received a course of three human papillomavirus ("HPV") vaccinations (brand name Gardasil) on April 2, 2009; January 28, 2010; and July 26, 2010. Pet. Ex. 3 at 1.

Petitioner avers that she "developed the first potential signs of GPA" "shortly after" the January 28, 2010 HPV vaccination. Petition at ¶ 4; *see also* Pet. Fee App. at 4. Petitioner did not provide any further detail, such as citations to particular medical records or an affidavit. In my view, the most probative medical record is dated August 30, 2010 by Dr. Andrew Zeft, a rheumatologist at the University of Utah Pediatric Rheumatology Clinic. This was his initial consult with petitioner.[5] He went on to diagnose petitioner with GPA.

On August 30, 2010, Dr. Zeft recorded petitioner's history of nose bleeds for "the last three or four months," which would date back to April or May 2010. Pet. Ex. 4 at 8-9. This could represent the first symptom of GPA but would be at least two months after the January 28, 2010 HPV vaccine and several months *before* the July 26, 2010 HPV vaccine.

Dr. Zeft also recorded petitioner's history of joint pain (another symptom of GPA, *supra* footnote 4) since "early July 2010."[6] This would also be several months after the January 28, 2010 vaccine and *before* the July 26, 2010 HPV vaccine.

Neither complaint supports a strong temporal association between HPV vaccines and the original onset of petitioner's GPA in 2010. Neither has petitioner provided any treating physician or expert's opinion supporting vaccine causation for the original onset. However, that does not rule out reasonable basis for petitioner's claim that the second round of HPV vaccinations significantly aggravated that condition, which will be discussed below.

### 3. Intervening Period[7]

The medical records reflect that in 2010 and 2011, petitioner's GPA was mild. She was treated with oral methotrexate (a chemotherapy drug) and steroids. Pet. Ex. 4 at 1-6; Pet. Ex. 12 at 1-8. In 2012, she began to have more significant disease including problems with her ears and a sinus infection. Her steroids were increased. *See, e.g.*, Pet. Ex. 12 at 1-8, Pet. Ex. 3 at 175-77. In early 2013, petitioner developed recurrent inflammation within her nasal cavity, sinus disease, and cough. Pet. Ex. 3 at 72-74, 115, 147, 164-66; Pet. Ex. 12 at 9-10; Pet. Ex. 8 at 1. In late February 2013, she had a positive C-ANCA screen for the first time since her diagnosis. Pet. Ex. 3 at 116. Toward the end of 2013, her symptoms became much worse, with a dry cough,

---

[5] Petitioner was referred to Dr. Zeft by a Dr. James Nusrala in Corvallis, Oregon. Petitioner has not filed medical records from Dr. Nusrala.

[6] See also Pet. Ex. 3 at 30 (December 2013 medical record providing that three years earlier, "she initially developed polyarthralgia, polyarthritis, and recurrent facial sinusitis recurrent nasal bleeding"); Pet. Ex. 1 at 4 (April 2014 medical record providing that her condition "began with arthralgias").

[7] This section is taken in large part from respondent's response to the motion for attorneys' fees and costs, Resp. Response at 2-4, but the Court has independently reviewed the medical records and added additional details.

shortness of breath, and hoarse voice, and the development of a saddle nose deformity[8] and subglottic stenosis due to her disease.  Pet. Ex. 3 at 30-33, 141, 279.

In early 2014, petitioner's symptoms began to worsen, with evidence of significant involvement of the nasal mucosa.  Pet. Ex. 3 at 27-29.  In January 2014, she was placed on Rituximab.  Pet. Ex. 5 at 1.  She required surgical dilation of her subglottic stenosis.  Pet. Ex. 11 at 11.  This procedure helped for about a month, but she developed shortness of breath again with decreasing doses of prednisone (a steroid).  Pet. Ex. 3 at 41-44.  Her medications were adjusted.  *Id.*  She also left school and returned home due to her illness.  Pet. Ex. 13 at 1.

In late April and May 2014, she still had worsening symptoms with shortness of breath, hearing loss, active lesions in her nose, and other problems.  On April 26, 2014, Dr. Schindler, a laryngologist and head and neck surgeon at the University of Oregon Health and Science University (OHSU) – Northwest Clinic for Voice and Swallowing, conducted a new patient evaluation.  After reviewing petitioner's history and conducting an evaluation, Dr. Schindler recorded that she had "dyspnea, hearing loss, and nasal collapse associated with GPA that looks active today on exam."  Prednisone was at 20 mg/ day.  Pet. Ex. 1 at 4-8; *see also* Pet. Ex. 10 at 72-74 (May 1, 2014 medical record from rheumatologist Dr. Garg).

On July 7, 2014, Dr. Schindler recorded that petitioner had worsened breathing and hearing.  He increased prednisone to 40 mg/ day for 2 weeks, then decreased to 30 mg/ day for one month.  Pet. Ex. 1 at 16-20.  On July 15, 2014, Dr. Schindler performed another surgical dilation of her airway.  Pet. Ex. 1 at 98-103.  It was noted at this time that her lungs were affected.  Pet. Ex. 10 at 298.  She was doing better after this on Cytoxan and weaning prednisone doses.  *Id.* at 361, 447, 516.

On September 28, 2014, Dr. Schindler recorded that petitioner was taking prednisone 40 mg per day.  She had tolerated the surgery in July well, she had "no signs of active nasal or subglottic [GPA]," and she responded to the injected and higher dose oral steroid favorably.  "She [could] wean her oral steroid as the Cytoxan becomes active.  [Dr. Schindler would] see her back in approximately 2-3 months, or sooner if symptoms worsen."  Pet. Ex. 1 at 36-39.

### 4. Second Round of HPV Vaccines and Subsequent History

The October 28, 2014 appointment was for an annual/routine gynecological examination.  The gynecologist recorded that petitioner "recently completed a course of Cytoxan and Lupron for [GPA,]" recently had throat surgery, and was awaiting nasal surgery.  Pet. Ex. 2 at 4-5.  Petitioner was reportedly taking prednisone, methotrexate, and several other medications.  *Id.* at 5.  Notably, the physical examination did not show signs of respiratory abnormalities or distress.  *Id.* at 7.  The assessment included "need for HPV vaccine" and petitioner received the first of the three-dose series.  *Id.* at 7-8.  The medical records from this visit do not reflect the petitioner previously completed a three-dose HPV vaccine series back in 2011.  It is possible that petitioner

---

[8] A "saddle nose deformity" is defined as a "concavity of the contour of the bridge of the nose due to collapse of cartilaginous or bony support, or both," which is associated with GPA.  *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012) at 1291.

needed a repeat course of HPV vaccine because her treatment for GPA, including chemotherapy drugs, wiped out her immune system.  An alternative explanation could be that the medical provider giving the HPV vaccines in 2014 may not have been aware of the previous HPV vaccines administered at a different medical practice back in 2011.  At any rate, it appears that in 2014, the gynecologist was aware of petitioner's history of GPA but did not see any contraindication for administering the HPV vaccine.

Two days after receiving the first HPV vaccine at issue in this claim, on October 30, 2014, petitioner presented to her surgeon Dr. Schindler for a follow-up.  She was taking prednisone at 17.5 mg daily as well as methotrexate.  She reported feeling "good" and had no complaints of shortness of breath on exertion, noisy breathing, or upper respiratory infection.  She planned to undergo a rhinoplasty to correct the saddle nose deformity in December 2014 (in approximately two months' time).  After performing a physical evaluation, Dr. Schindler assessed that petitioner's "previously diagnosed granulomatosis with polyangiitis (GPA) does not appear at this time."  Pet. Ex. 1 at 44-45.  His assessment continued:

> I have grave concerns about her undergoing rhinoplasty in the next couple of months, however.  She has not demonstrated adequacy of her immunosuppression off prednisone yet and I fear that surgery to correct her saddle nose deformity and septal perforation could "reawaken" her disease.  I would like to see her stably managed on methotrexate and quiescent for several months before surgery on a known site of activity for her.  I fear that withdrawal of her immunosuppression around surgery for more than a brief period could result in reactivation of the GPA and loss of the reconstruction.  We talked about this for a while and I promised that I would review my thoughts with Dr. Wang and Dr. Garg.  My thoughts for her nasal surgery would be more like 6 months from now with demonstrated quiescence on methotrexate and off oral steroids.  She was extremely disappointed by this, but I really think that there is one good opportunity to the nasal reconstruction and I have seen this operation fail in patients with continued disease activity.  She will need very careful management of her immunosuppression through surgery to help prevent flare.  I do believe that she can continue her inhaled corticosteroid for the subglottic and bronchial disease and topical nasal steroid may be useful around the time of nasal surgery.

*Id.* at 45.  Dr. Schindler increased prednisone to 27.5 mg/ day for 2 weeks, then down to 25 mg/ day for 2 weeks.  He planned to see petitioner again in three months or sooner if symptoms worsened.  *Id.* at 45-46.

On November 25, 2014, petitioner received the second HPV vaccine at issue.  Pet. Ex. 7 at 1.  On November 26, 2014, petitioner presented to her primary care practice with a two-week history of stomach discomfort, bloating, decreased appetite, loose stools, fatigue, dry skin, and urine smelling like ammonia.  The assessment was abdominal pain and fatigue and she was recommended to follow up if there was no improvement.  Pet. Ex. 8 at 6-7.  On December 2, 2014, she returned to the primary care practice with complaints of low energy, increased depression, headaches, and some anxieties.  The primary assessment was GPA, with a notation that petitioner had been tapering down prednisone 2.5 mg every two weeks.  *Id.* at 8-9.

On December 15, 2014, petitioner presented to Dr. Schindler for a follow-up visit. She reported "feeling worse" and an "increasing shortness of breath and dyspnea on exertion," "noisy breathing on inspiration," and a "popping" sound in her left ear. Pet. Ex. 1 at 55. Petitioner remained on methotrexate, but had tapered prednisone down to 7.5 mg/ day. Dr. Schindler recorded that petitioner's GPA was "inadequately controlled with evidence of nasal, tracheobronchial and advancing subglottic disease right now." *Id.* at 59. He recommended "adjustments to her immunosuppressants to get better control of the disease off prednisone." *Id.* He increased prednisone to 15 mg/ day. He also recommended a CT scan of her chest. *Id.* The CT scan showed "scattered areas of mosaicism, likely reflecting minimal focal bronchiolitis obliterans, which can be seen as a sequela of a prior infection or inflammation." Pet. Ex. 1 at 54-59.

Additionally, on December 18, 2014, rheumatologist Dr. Gard evaluated petitioner and agreed that she was experiencing a flare of GPA and that prednisone should be increased. Pet. Ex. 10 at 575. On February 24, 2015, petitioner received the third HPV vaccine at issue. Ex. 7 at 1. She was seen the following few months and was doing better each time while weaning off prednisone again. Pet. Ex. 1 at 68-89; Pet. Ex. 10 at 743, 793-94; Pet. Ex. 8 at 26, 30, 37; Pet. Ex. 13 at 82, 87, 93. As of October 2015, she continued to improve and was thought finally to be in remission. Pet. Ex. 13 at 98-100.

The medical records from late September and October 2014 do not expressly say that petitioner was in "remission" before receiving the HPV vaccines at issue in the significant aggravation claim. However, those records do suggest that her condition was improving and approaching quiescience. Additionally, the medical records reflect that within 30 days after petitioner received the first HPV vaccine at issue, petitioner did experience of GPA. Indeed, within 45 days after the HPV vaccine, Dr. Schindler, the doctor managing her GPA, confirmed the flare and recorded that her condition was "inadequately controlled."

I find particularly persuasive Dr. Schindler's concern about activation of petitioner's GPA, an autoimmune condition, during the tapering down of prednisone. Dr. Schindler specifically advised against nasal surgery which petitioner wanted to undergo. He does not mention the advisability of HPV or any other vaccines during the tapering down of prednisone. He may not have been asked about the HPV vaccines or aware that petitioner received them (from a different medical provider). It is entirely possible that if Dr. Schindler was consulted, he would have expressed concern about the HPV vaccines being administered during this time period, as he did about the nasal surgery.

If petitioner had filed her remaining medical records and a statement of completion and the case proceeded on a litigation track, I likely would have authorized petitioner to seek a further statement or an expert opinion as to whether the vaccines, which are designed to cause an immune response, can cause or substantially contribute to a flare of GPA, an autoimmune condition during the vulnerable time period while prednisone (an immunosuppressant) is being tapered down. *See, e.g.*, *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344 (Fed. Cir. 1999) (holding that a petitioner may prevail on entitlement by demonstrating that a vaccine was a "substantial factor" contributing to the injury). I would also question whether there is evidence that the HPV vaccines administered to petitioner in 2014 - 2015 did cause or contribute to a flare

of her GPA, whether that flare constituted a significant aggravation of her GPA, and whether the timing was medically acceptable.  *See Althen v. Sec'y of Health & Human Servs.*, 17 F.3d 374 (Fed. Cir. 1994); *Loving v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 135, 144 (2009), *see also W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352 (Fed. Cir. 2007).  I would also ask whether petitioner's post-vaccination course was simply "consistent with the usual course of GPA and/or associated changes in her medications," as respondent argues for the first time in his response contesting reasonable basis.  Resp. Response at 6.  This may be a valid argument, but in my view, it would be more appropriately addressed at a later stage in the claim with the input of qualified medical experts.

However, before the case reached that stage, petitioner requested a dismissal decision. When she did, the claim had been pending for ten months.  It had taken petitioner and her counsel significant time to obtain thousands of pages of medical records from providers in at least two states.  She was still working to obtain the remaining medical records and a statement of completion.  I had not provided my preliminary view of the claim (except for noting that any alleged injuries from the 2009 – 2010 HPV vaccines were time-barred).  Respondent had not filed a Rule 4(c) report or even a status report providing his view of the claim.  Therefore, petitioner and her counsel appear to have made an independent decision to dismiss the claim, not because of any issues that had been clearly identified for them.  In my experience, a petitioner sometimes decides to dismiss a claim for personal reasons such as improvement of his or her medical status, wanting to move on with his or her life, and the delays currently present in the Vaccine Program.  The decision may also be based on prudent advice from counsel with experience in the Program.

Additionally, in her motion for a dismissal decision, petitioner did not state that the evidence was insufficient to bring her claim.  She stated only that she understood that a decision by the special master dismissing her petition would result in a judgment against her, that such a judgment would end all of her rights in the Vaccine Program, and that after judgment was entered that she would be permitted to apply for attorneys' fees and costs.  Thus, the voluntary dismissal will not be held against petitioner or her attorney.

In sum, I find that the medical records documenting a flare of an autoimmune disease shortly after administration of a covered vaccine provided reasonable basis for filing this petition and for pursuing it until the voluntary dismissal at an early stage.[9]

## III.   Reasonable Attorneys' Fees and Costs

### A.   Legal Standard

As stated above, the Vaccine Act only authorizes "reasonable" attorneys' fees and costs. The Federal Circuit has approved use of the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act.  *Avera*, 515 F.3d at 1349.  Using the lodestar approach, a court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the

---

[9] If the claim had proceeded, it may have lost reasonable basis at some point.  However, that did not occur here.  My determination is based on the limited filings and procedural history before me.

number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* at 1347-58 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)).  Then, the court may make an upward or downward departure from the initial calculation of the fee award based on other specific findings.  *Id.* at 1348.  Although not explicitly stated in the statute, the requirement that only reasonable amounts be awarded applies to costs as well as to fees.  *See Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994).

Special masters have "wide discretion in determining the reasonableness of both attorneys' fees and costs."  *Hines v. Sec'y of Health & Human Servs.*, 22 Cl. Ct. 750, 753 (1991). They may look to their experience and judgment to reduce the number of hours billed to a level they find reasonable for the work performed.  *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993).  A line-by-line evaluation of the billing records is not required. *Wasson v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 482, 483 (1991), *aff'd in relevant part*, 988 F.2d 131 (Fed. Cir. 1993 (per curiam).

The petitioner "bea[rs] the burden of establishing the hours expended, the rates charged, and the expenses incurred" are reasonable.  *Wasson*, 24 Cl. Ct. at 484.  Adequate proof of the claimed fees and costs should be presented when the motion is filed.  *Id.* at 484, n. 1.  Counsel "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission."  *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

### B.  Hourly Rates

The interim fee decision in *McCulloch* provides a framework for consideration of appropriate ranges for attorneys' fees based upon an individual's experience.  *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), *motion for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015).  The Court has since updated the *McCulloch* rates.  The Attorneys Forum Hourly Rate Fee Schedules for 2015-2016, 2017, 2018, and 2019 can be accessed online.[10]

In this case, petitioner requests that her attorney Mr. Mark Sadaka be compensated at hourly rates of $350.00 for work performed in 2015; $362.95 in 2016; $376.38 in 2017; and $396.00 in 2018.  She requests that two of Mr. Sadaka's regular paralegals receive $135.00 for work performed in 2015; $140.00 in 2016; $145.17 in 2017; and $150.55 in 2018.  These individuals have previously received these rates for work in the Vaccine Program.  *See, e.g.*, *Wright v. Sec'y of Health & Human Servs.*, No. 15-1436V, 2018 WL 6828711 (Fed. Cl. Spec. Mstr. Nov. 27, 2018).  I find they are also reasonable in the present case and should be awarded.

### C.  Hours Expended

As previously noted, a line-by-line evaluation of the fee application is not required and will not be performed.  *Wasson*, 24 Cl. Ct. at 484.  Rather, I may rely on my experience to

---

[10] United States Court of Federal Claims – OSM Attorneys' Forum Hourly Rate Fee Schedules, available at http://www.cofc.uscourts.gov/node/2914.

evaluate the reasonableness of hours expended. *Id.* Just as "[t]rial courts routinely use their prior experience to reduce hourly rates and the number of hours claimed in attorney fee requests …. [v]accine program special masters are also entitled to use their prior experience in reviewing fee applications." *Saxton*, 3 F.3d at 1521.

Here, the billing entries reflect 60.1 hours expended on the case by Mr. Sadaka and his two paralegals. The billing records are sufficiently detailed for the Court's review. They reflect entries largely associated with initial intake of the petitioner's claim, a limited amount of case-specific research, obtaining voluminous medical records, and filings with the Court. Mr. Sadaka appropriately delegated tasks that do not require a lawyer's time and a lawyer's higher billing rate, such as requesting medical records, to his experienced paralegals. Accordingly, I find that the hours expended are reasonable and should be awarded.

### D. Costs

Like attorneys' fees, costs incurred - by counsel or petitioners themselves - must be reasonable to be reimbursed by the Program. *Perreira*, 27 Fed. Cl. 29, 34. Here, petitioner's counsel request $1,528.12 for the costs of obtaining medical records, filing the claim, postage, and certified mail of key court documents to the petitioner. Pet. Fees App., Ex. A at 11. These costs are adequately documented and appear reasonable. Pet. Fees App, Ex. B. Therefore, the costs are also awarded in full.

## IV.    Conclusion

In accordance with the foregoing, petitioner's application for attorneys' fees and costs is **GRANTED**. I find that she is entitled to the following reasonable attorneys' fees and costs at this time:

| | |
|---|---|
| **Attorneys' Fees Awarded:** | **$15,838.84** |
| **Attorneys' Costs Awarded:** | **$1,528.12** |
| **<u>Attorneys' Fees and Costs Awarded:</u>** | **<u>$17,366.96</u>[11]** |

Accordingly, I award the following:

1) **A lump sum in the amount of $17,366.96, representing reimbursement for attorneys' fees and costs, in the form of a check payable jointly to petitioner and her counsel, Mark T. Sadaka of Mark T. Sadaka, LLC.[12]**

---

[11] As noted above, petitioner's motion for attorneys' fees and costs and her reply in support of reasonable basis, request a higher award of $<u>2</u>7,366.96. However, that appears to be a typographical error. This decision reflects the attorneys' fees and costs which are documented in the underlying billing records. Pet. Fees App., Ex. A at 10-11.

[12] This amount is intended to cover all legal expenses incurred in this matter. This award encompasses all charges by the attorney against a client, "advanced costs," and fees for legal services rendered. Furthermore, Section 15(e)(3) prevents an attorney from charging or collecting fees (including costs) that would be in addition to the amount awarded herein. *See generally Beck v. Sec'y of Health & Human Servs.*, 924 F.2d 1029 (Fed. Cir. 1991).

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court is directed to enter judgment forthwith.[13]

**IT IS SO ORDERED.**

**s/Thomas L. Gowen**
Thomas L. Gowen
Special Master

---

[13] Entry of judgment is expedited by each party's filing notice renouncing the right to seek review.  Vaccine Rule 11(a).