# In the United States Court of Federal Claims

**No. 17-1580V**
**Filed: December 9, 2019**
**Reissued for Publication: January 6, 2020[1]**

* * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| **JESSICA HARDING,** | * |
| | * |
| **Petitioner,** | * |
| | * |
| **v.** | * **Vaccine Act; Motion for Review;** |
| | * **Attorney's Fees and Costs;** |
| **SECRETARY OF THE DEPARTMENT** | * **Reasonable Basis.** |
| **OF HEATH AND HUMAN SERVICES,** | * |
| | * |
| **Respondent.** | * |
| | * |

* * * * * * * * * * * * * * * * * *

**Mark T. Sadaka**, Sadaka Associates LLC, Englewood, NJ, for petitioner.

**Voris E. Johnson**, Senior Trial Attorney, Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., for respondent. With him were **Catharine E. Reeves**, Deputy Director, Torts Branch, **C. Salvatore D'Alessio**, Acting Director, Torts Branch, Civil Division, and **Joseph H. Hunt**, Assistant Attorney General, Civil Division.

**O P I N I O N**

### HORN, J.

On October 20, 2017, petitioner, Jessica Harding, filed a request for vaccine compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 (2012) (Vaccine Program), in the United States Court of Federal Claims Office of Special Masters. On August 20, 2018, petitioner filed an unopposed motion with Special Master Thomas L. Gowen to dismiss her petition. On August 21, 2018, the Special Master issued a "Decision on Entitlement," dismissing petitioner's claim for insufficient proof. On February 28, 2019, petitioner filed an "Application for Attorney Fees and Costs," requesting $17,366.96 in attorney's fees and costs.[2] On June 18, 2019, the Special

---

[1] This Opinion was issued under seal on December 9, 2019. The parties did not propose any redactions to the December 9, 2019 Opinion, and the court, therefore, issues the Opinion without redactions for public distribution.

[2] The application itself states that petitioner requests "$27,366.96 for attorney's fees and costs," but the record of time submitted with the application shows that the attorney's fees and costs totaled $17,366.96. In his decision on attorney's fees and costs, Special Master Gowen noted the discrepancy between the application and the underlying document

Master issued his "Decision on Attorneys' Fees and Costs," granting in full the petitioner's motion and awarding $17,366.96 in attorney's fees and costs.[3] See generally Harding v. Sec'y of Health & Human Servs., No. 17-1580V, 2019 WL 3215974 (Fed. Cl. Spec. Mstr. June 18, 2019). Respondent timely filed a motion for review of the Special Master's decision on the limited issue of attorney's fees and costs in the United States Court of Federal Claims.

## FINDINGS OF FACT

According to the records before this court, petitioner Jessica Harding was born on August 2, 1993 and resided in Albany, Oregon at the time she timely filed her petition for compensation. Petitioner claimed that she suffered "vaccine induced aggravation of Wegener's granulomatosis, also known as granulomatosis polyangiitis [sic]" or GPA[4] after she received a second series of the three-shot human papillomavirus (HPV) vaccination (brand name Gardasil). Twice petitioner received the series of the three-shot HPV vaccination. Petitioner received the first series of three shots on April 2, 2009, January 28, 2010, and July 26, 2010. On August 30, 2010, petitioner saw Dr. Andrew Zeft at the University of Utah's Pediatric Rheumatology Clinic and described "having joint pain everywhere" which petitioner reported as having begun in "early July 2010" and having "persisted for approximately two months." Petitioner also reported to Dr. Zeft that she had been experiencing "bloody noses for the last three or four months." On September 13,

---

[3] Special Master Gowen awarded attorney's fees in the amount of $15,838.84, and costs in the amount of $1,528.12. See Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *9.

[4] In his decision on attorney's fees and costs, Special Master Gowen cited the Mayo Clinic definition of granulomatosis with polyangiitis or GPA, stating that "GPA specifically 'causes inflammation of the blood vessels in your nose, sinuses, throat, lungs, and kidneys,'" with signs and symptoms that "'can develop suddenly or over several months,'" and includes symptoms such as:

> "pus-like drainage with crusts from your nose, stuffiness, sinus infections and nosebleeds; coughing, sometimes with bloody phlegm, shortness of breath or wheezing; fever; fatigue; joint pain; numbness in your limbs, fingers, or toes; weight loss; blood in your urine; skin sores, bruising, or rashes; eye redness, burning or pain, and vision problems; [and] ear inflammation and hearing problems."

Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *1, *3 (quoting Mayo Clinic, Granulomatosis with Polyangiitis, https://www.mayoclinic.org/diseases-conditions/granulomatosis-with-polyangiitis/symptoms-causes/syc-20351088 (last visited Dec. 9, 2019)) (alteration in original).

The footnote text at the top of the footnote section reads: submitted and stated that the "digit '2' was most likely an inadvertent error." Petitioner did not dispute the Special Master's assumption that the amount of the attorney's fees and costs claimed in her submissions totaled $17,366.96.

2

2010, Dr. Zeft diagnosed the petitioner with GPA. Petitioner was treated with methotrexate and prednisone. Dr. Zeft made no notation in the records provided to the court about petitioner having received the HPV vaccination.

As indicated in petitioner's exhibits submitted to Special Master Gowen, in 2012, petitioner saw Dr. Stephen Parsons at PEAK ENT Associates with "severe rhinitis in the LEFT nasal cavity, as well as sinusitis over the past couple of months," and for a "RIGHT middle ear effusion with some decreased hearing in the right ear." (capitalization in original). On May 1, 2012, petitioner underwent surgery for bilateral ear tube placement to treat her hearing problems. The medical records submitted to the Special Master indicate that petitioner's symptoms began to worsen in late 2012. In October 2012, petitioner saw Dr. Malgorzata Hanczyc at Central Utah Clinic in Provo, Utah with a sinus infection and saw Dr. Parsons at PEAK ENT Associates complaining of significant pain in her ear. Dr. Stephens noted, at that time, that petitioner's GPA "seems to be under good control." In late February 2013, petitioner tested positive for C-ANCA. In May 2013, petitioner saw Dr. Justin Jones at Central Utah Clinic with severe headache, nasal pressure, and pain in her neck. In early October 2013, petitioner saw Dr. Jones complaining of a chronic dry cough, and was diagnosed with asthma. In December 2013, petitioner saw Dr. Yong Zhu, a rheumatologist with the Corvallis Clinic complaining of "shortness of breath, intermittent nasal bleeding, and fatigue." Dr. Zhu summarized petitioner's history of GPA, noting that "[s]he has been treated with prednisone therapy for one year in combined [sic] with methotrexate. She has 3 years therapy of methotrexate," and "[d]uring the last a [sic] couple years, she gradually developed saddle nose."[5] Petitioner also saw a pulmonologist, Dr. Vincent Gimino, in December 2013, who noted that petitioner had developed "upper airway obstruction, most likely subglottic stenosis related to underlying Wegener's granulomatosis."

In January 2014, Dr. Nick Benton evaluated petitioner and noted "[t]he patient was not well managed for a number of months and subsequently has had worsening symptoms." Dr. Benton noticed "issues with nasal Wegener's with some nose bleeding and nasal discharge," but "did not see other evidence of tracheal involvement with Wegener's" other than "a thin subglottic stenosis," which he believed would be "amenable to dilation." Dr. Zhu referred petitioner to rheumatologist Dr. Steven Call in Utah, who saw petitioner on January 10, 2014 and noted that petitioner's "airway is about 50% of what it should be at this point." Dr. Call placed petitioner on the drug Rituximab. On January 16, 2014, petitioner underwent surgical dilation for her subglottic stenosis. On February 11, 2014, petitioner saw Dr. Call for a follow-up appointment, and Dr. Call noted that petitioner was moving back to Albany, Oregon to have the support of her family while she received treatment for GPA. Dr. Call noted that petitioner had tapered her prednisone to 20 mg, but experienced shortness of breath and he, therefore, increased her dose of prednisone to 30 mg.

---

[5] "A 'saddle nose deformity' is defined as a 'concavity of the contour of the bridge of the nose due to collapse of cartilaginous or bony support, or both,' which is associated with GPA." Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *4 n.8 (quoting Dorland's Illustrated Med. Dictionary 1291 (32nd ed. 2012)).

On April 26, 2014, petitioner saw Dr. Joshua Schindler, an otolaryngologist and head and neck surgeon at the University of Oregon Health and Science University (OHSU) – Northwest Clinic for Voice and Swallowing, for difficulty with her breathing. Dr. Schindler's assessment was that petitioner "appears to have dyspnea, hearing loss and nasal collapse associated with granulomatosis with polyangiitis (GPA) that looks active today on exam." In July 2014, Dr. Schindler noted that petitioner's airway was narrowed after she saw him complaining of worsened breathing. Dr. Schindler then performed another surgical dilation of her airway. By September 28, 2014, when petitioner returned to Dr. Schindler for her first post-operative visit, petitioner told Dr. Schindler that she felt better and was taking 40 mg of prednisone per day. In his assessment at that first post-operative visit, Dr. Schindler noted that petitioner "looks better to me today than she did in the operating room and has no signs of active nasal or subglottic granulomatosis with polyangiitis (GPA)." Dr. Schindler also suggested that petitioner could wean her oral steroid dose "as the Cytoxan becomes active."

Between 2014 and 2015, petitioner received the second series of the three shots of the HPV vaccination. Petitioner received the first shot in the second series of the HPV vaccination on October 28, 2014 from Dr. Kristin Berry, a gynecologist with Samaritan Health Services. Dr. Berry had previously noted in petitioner's records that petitioner was starting on Cytoxan for treatment of her GPA and that petitioner's physician "recommended that the patient be on Lupon to suppress her ovaries during the time that she is on Cytoxan as the medication can cause damage to her ovaries of [sic] not protected." Special Master Gowen noted that Dr. Berry's physical assessment of petitioner on October 28, 2014 "did not show signs of respiratory abnormalities or distress." Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *5. In this decision, Special Master Gowen offered the following discussion of why Dr. Berry may have started petitioner on another series of the HPV vaccination:

> The medical records from this visit do not reflect the petitioner previously completed a three-dose HPV vaccine series back in 2011. It is possible that petitioner needed a repeat course of HPV vaccine because her treatment for GPA, including chemotherapy drugs, wiped out her immune system. An alternative explanation could be that the medical provider giving the HPV vaccines in 2014 may not have been aware of the previous HPV vaccines administered at a different medical practice back in 2011. At any rate, it appears that in 2014, the gynecologist was aware of petitioner's history of GPA but did not see any contraindication for administering the HPV vaccine.

Id.

Two days later petitioner saw Dr. Schindler for a follow-up visit and he noted in his assessment that she was taking 17.5 mg of prednisone and methotrexate. He indicated that petitioner "continues to look good," and that her GPA "does not appear active at this time." At this visit, petitioner informed Dr. Schindler that she had scheduled a rhinoplasty for December 2014 with Dr. Wang. Dr. Schindler addressed his concerns about petitioner undergoing surgery at length in his assessment, stating:

> I have grave concerns about her undergoing rhinoplasty in the next couple of months, however. She has not demonstrated adequacy of her

4

immunosuppression off prednisone yet and I fear that surgery to correct her saddle nose deformity and septal perforation could "reawaken" her disease. I would like to see her stably managed on methotrexate and quiescent for several months before surgery on a known site of activity for her. I fear that withdrawal of her immunosuppression around surgery for more than a brief period could result in reactivation of the GPA and loss of the reconstruction. We talked about this for a while and I promised that I would review my thoughts with Drs. Wang and Garg. My thoughts for her nasal surgery would be more like 6 months from now with demonstrated quiescence on methotrexate and off oral steroids.

Dr. Schindler increased petitioner's prednisone dose to 27.5 mg per day for two weeks, and then 25 mg per day for two weeks. The records submitted by petitioner suggest that she did not undergo rhinoplasty until September 1, 2015.

The second shot in the second HPV vaccination series was administered to petitioner on November 25, 2014. On November 26, 2014, the next day, petitioner went to her primary care practice complaining of stomach discomfort and urine smelling of ammonia for two weeks. Petitioner's records from the visit noted that petitioner was tapering prednisone at 2.5 mg decrease every two weeks and was taking 10 mg of prednisone per day at the time of her visit. Petitioner was diagnosed with abdominal pain and fatigue and recommended for a follow-up visit with her primary care physician if her symptoms did not improve. On December 2, 2014, petitioner returned to her primary care practice complaining of "low energy, tapering off long term use of prednisone, increased depression, headaches, some anxieties." Petitioner's medical records from this visit note that she was taking 10 mg of prednisone per day as well as methotrexate. Petitioner's primary care physician, Dr. Rampton, assessed petitioner as having "Wegener's granulomatosis" with a note about tapering steroids, as well as headache, depression, and anxiety, all of which he attributed to "[s]teroid withdrawal."

Almost two weeks later, on December 15, 2014, petitioner saw Dr. Schindler for a follow-up visit and she said she was feeling "worse." Petitioner underwent a pulmonary function test and the results were "substantially worse than her prior study of 7/11/14." Dr. Schindler's assessment was that petitioner "looks like her granulomatosis with polyangiitis (GPA) is inadequately controlled with evidence of nasal, tracheobronchial and advancing subglottic disease right now." Dr. Schindler increased prednisone to 15 mg per day for two weeks with instructions to taper by 2.5 mg every two weeks thereafter. Dr. Schindler suggested making "adjustments to her immunosuppression to get better control of the disease off prednisone." Dr. Garg examined petitioner three days later, on December 18, 2014, and assessed petitioner as having "active disease despite 6 cycles of cytoxan." Dr. Garg increased petitioner's prednisone dose to 60 mg per day for two weeks and then down to 40 mg per day while tapering down to 10 mg per day over three months. On January 8, 2015, petitioner once again underwent surgical dilation of her airway. On February 24, 2015, petitioner received her third and final shot for the second series of the HPV vaccination. In the months following petitioner's final shot for the second series of the HPV vaccination, she continued to taper prednisone, but it was noted that in March 2015 that "her disease appears to be quiescent." Dr. Sibley, a rheumatologist in Portland, Oregon, stated in progress notes forwarded to Dr. Rampton in August 2015 that

petitioner "eventually achieved remission and has been treated with rituximab 375mg/kg iv x 4 weekly doses starting 4/2015."

As indicated above, on October 20, 2017,[6] petitioner filed her petition pursuant to the Vaccine Program, and the case was assigned to Special Master Gowen. On October 26, 2017, petitioner filed exhibits of medical records, totaling more than 2,000 pages, to try to support her claim. On November 6, 2017, Special Master Gowen ordered petitioner to file any remaining medical records and a Statement of Completion by December 1, 2017. On December 1, 2017, petitioner filed an unopposed motion for extension of time until January 30, 2018 because she had "ordered, but has not yet received, medical records from all of her treating physicians." Special Master Gowen granted petitioner's motion and ordered petitioner to file her outstanding medical records and a Statement of Completion by January 30, 2018. On January 30, 2018, petitioner filed a second unopposed motion for extension of time until March 30, 2018 to file medical records which she indicated she had ordered but not yet received from "approximately five providers" who petitioner had identified as potentially having medical records pertaining to her injuries. The Special Master issued an order granting petitioner's motion until March 30, 2018. The Special Master indicated that he would not view the petition as complete until petitioner had filed a Statement of Completion, and that respondent's status report was to be filed within 60 days of the filing of petitioner's Statement of Completion as opposed to within 60 days of the initial filing of the petition pursuant to Vaccine Rule 4(a).

On February 2, 2018, petitioner submitted an exhibit of medical records from her gynecologist at Samaritan Health Services. On February 23, 2018, petitioner filed two additional exhibits of medical records, the first from petitioner's ophthalmologist at OHSU and the second from petitioner's gynecologist at OHSU. On March 29, 2018, petitioner filed a third unopposed motion for extension of time until May 29, 2018, stating that "[p]etitioner has one final medical record to submit which has been ordered and is in the process of being obtained." The Special Master granted in part, and, denied in part, petitioner's motion for extension of time, ordering that "**Petitioner shall file the outstanding medical records and a Statement of Completion within 45 days, by Monday, May 14, 2018.**" (emphasis in original). On May 14, 2018, petitioner filed a fourth unopposed motion for extension of time until June 13, 2018, stating that the petitioner had received "an invoice for the final medical record needed and is in the process of obtaining." On the following day, the Special Master granted petitioner's motion.

On June 13, 2018, petitioner filed a status report regarding how she planned to proceed with her case. The status report stated: "Petitioner has indicated to her counsel that she wishes to discontinue her case. Petitioner's counsel respectfully requests thirty (30) days or until July 13, 2018 to file a motion for a decision on this case." On June 14, 2018, the Special Master issued an order granting petitioner's request. On June 20, 2018, Special Master Gowen issued an order informing the parties that "[t]he statutory 240-day period for the special master's issuance of a decision in this case has expired." Petitioner

---

[6] There does not appear to be further information in petitioner's October 20, 2017 petition or Special Master Gowen's decisions and orders about any medical developments between August 2015 and the filing of the petition with the United States Court of Federal Claims Office of Special Masters on October 20, 2017.

was ordered to submit a notice continuing or withdrawing the petition within 30 days, or by July 20, 2018.

On July 13, 2018, petitioner submitted a request for a status conference "to discuss next steps." Special Master Gowen held a  status conference on July 19, 2018. In an Order to Show Cause issued on the same day, July 19, 2018, the Special Master indicated that during the status conference, Mr. Sadaka, petitioner's counsel of record, "stated that petitioner had verbally indicated that she wished to discontinue her claim in the Vaccine Program. However, petitioner has been unwilling or unable to send Mr. Sadaka her written authorization." The Special Master "agreed that Mr. Sadaka needs petitioner's cooperation to either discontinue or continue with her claim." Special Master Gowen, therefore, ordered petitioner:

> **[T]o <u>either</u> file all remaining medical records and a Statement of Completion <u>or</u> deliver to counsel her written authorization to discontinue her claim <u>within 30 days, by Monday, August 20, 2018</u>. <u>Petitioner's failure to comply with this Order will be interpreted as a failure to prosecute her claim, which will result in its involuntary dismissal</u>.**

(emphasis in original).

On August 20, 2018, petitioner filed an unopposed "Motion for a Decision Dismissing her Petition." In her motion, petitioner stated that she "understands that a decision by the Special Master dismissing her petition will result in a judgment against her," and that "[s]he has been advised that such a judgment will end all of her rights in the Vaccine Program." The motion stated further that:

> Petitioner understands that she may apply for costs once her case is dismissed and judgment is entered against her. Petitioner's counsel has contacted respondent's counsel regarding respondent's position on this motion and understands that respondent expressly reserves the right, pursuant to 42 U.S.C. § 300aa-15(e), to question the good faith and reasonable basis of her claim and to oppose, if appropriate, her application for costs. Respondent otherwise does not oppose this motion [sic]

On August 21, 2018, the Special Master issued a "Decision on Entitlement," dismissing petitioner's claim for insufficient proof. In his decision, Special Master Gowen stated:

> Under the Vaccine Act, the Program may not award compensation solely based on a petitioner's own claims. Rather, a petitioner must support his [sic] claim with either medical records or the opinion of a competent physician. § 13(a)(1). The undersigned also notes that in his experience, significant aggravation claims can be particularly fact-intensive. Such a claim involves obtaining considerable medical records. It also involves comparing the petitioner's condition before and after the vaccination(s) at issue, and considering the possible course of the condition "but for" those vaccination(s). This further illustrates the importance of obtaining medical

records as well as a supportive opinion from a competent physician. However, petitioner has not filed these materials.

Judgment was entered by the Clerk of Court of the United States Court of Federal Claims on September 21, 2018, which stated: "Pursuant to the special master's decision, filed August 21, 2018, IT IS ORDERED AND ADJUDGED this date, pursuant to Vaccine Rule 11(a), that the case is dismissed for insufficient proof." (capitalization in original). The judgment also indicated that a motion for attorney's fees and costs need to be filed by represented petitioners within 180 days of judgment.

On February 28, 2019, petitioner filed an "Application for Attorney Fees and Costs" requesting $17,366.96. In her "Application for Attorney Fees and Costs," petitioner asserted that she had brought her claim in good faith because she "developed a relapse of GPA within 30-days after receiving a fourth Gardasil vaccine in October of 2014." Petitioner further asserted that under the totality of the circumstances analysis enunciated in Chuisano v. United States, 116 Fed. Cl. 276 (2014), the court should find that petitioner had a reasonable basis to bring her claim. Petitioner explained that because "[h]er GPA clearly started after the second Gardasil vaccine Petitioner received in 2010. At least one medical provider stated that her GPA was in remission around the time Petitioner received the fourth Gardasil vaccination. Finally, the record is clear that her health rapidly decompensated within 30-days thereafter." Based on the forgoing, petitioner argued that there was a reasonable basis to bring the claim.

On March 8, 2019, respondent filed a response opposing petitioner's "Application for Attorney Fees and Costs" on the grounds "that petitioner has failed to establish a reasonable basis for her claim." Respondent asserted that, under the United States Court of Appeals for the Federal Circuit's holding in Simmons v. Secretary of Health & Human Services, "the reasonable basis analysis must focus on whether there is evidentiary support for the claim set forth in the petition, not whether counsel acted reasonably in filing the petition." (citing Simmons v. Sec'y of Health & Human Servs., 875 F.3d 632, 636 (Fed. Cir. 2017)). Respondent stated that "[p]etitioner has not identified (nor has respondent located) any notation in the medical records indicating that her treating physicians believed the HPV vaccine played any role in causing or exacerbating her condition, nor has petitioner provided an expert report in support of her claim." Respondent further stated that "absent any objective evidence that the HPV vaccine caused or significantly aggravated petitioner's alleged injury, the claim has no feasibility of success," and, therefore, no reasonable basis for the claim has been established.

Special Master Gowen issued his "Decision on Attorneys' Fees and Costs" on June 18, 2019, granting in full the petitioner's motion and he awarded petitioner $17,366.96 in attorney's fees and costs. See Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *9. In his decision, the Special Master stated that petitioner was time-barred from claiming that the first series of HPV vaccinations was the cause-in-fact of her GPA because the vaccinations and the onset of her GPA symptoms "were well outside of the statute of limitations set forth by the Vaccine Act. § 16(a)(2)." Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *1. The Special Master further noted that the petition did not demonstrate "a strong temporal association between HPV vaccines and the original onset of petitioner's GPA in 2010," and further, at the time petitioner moved

to dismiss the petitioner, petitioner had not "provided any treating physician or expert's opinion supporting vaccine causation for the original onset," but that lack of support "does not rule out reasonable basis for petitioner's claim that the second round of HPV vaccinations significantly aggravated that condition." Id. at *4.

In granting petitioner's request, the Special Master discussed the factual findings summarized above, with references to the filings submitted by both parties. See id. at *3-6. The Special Master offered his analysis of the facts in the record, including:

> The medical records from late September and October 2014 do not expressly say that petitioner was in "remission" before receiving the HPV vaccines at issue in the significant aggravation claim. However, those records do suggest that her condition was improving and approaching quiescience [sic]. Additionally, the medical records reflect that within 30 days after petitioner received the first HPV vaccine at issue, petitioner did experience of [sic] GPA. Indeed, within 45 days after the HPV vaccine, Dr. Schindler, the doctor managing her GPA, confirmed the flare and recorded that her condition was "inadequately controlled."

Id. at *6. The Special Master also discussed a possible course of petitioner's claim had she not filed a motion for a decision dismissing the claim, stating:

> If petitioner had filed her remaining medical records and a statement of completion and the case proceeded on a litigation track, I likely would have authorized petitioner to seek a further statement or an expert opinion as to whether the vaccines, which are designed to cause an immune response, can cause or substantially contribute to a flare of GPA, an autoimmune condition during the vulnerable time period while prednisone (an immunosuppressant) is being tapered down. See, e.g., Shyface v. Sec'y of Health & Human Servs., 165 F.3d 1344 (Fed. Cir. 1999) (holding that a petitioner may prevail on entitlement by demonstrating that a vaccine was a "substantial factor" contributing to the injury). I would also question whether there is evidence that the HPV vaccines administered to petitioner in 2014 - 2015 did cause or contribute to a flare of her GPA, whether that flare constituted a significant aggravation of her GPA, and whether the timing was medically acceptable. See Althen v. Sec'y of Health & Human Servs., 17 F.3d 374 (Fed. Cir. 1994) [sic]; Loving v. Sec'y of Health & Human Servs., 86 Fed. Cl. 135, 144 (2009), see also W.C. v. Sec'y of Health & Human Servs., 704 F.3d 1352 (Fed. Cir. 2007). I would also ask whether petitioner's post-vaccination course was simply "consistent with the usual course of GPA and/or associated changes in her medications," as respondent argues for the first time in his response contesting reasonable basis. This may be a valid argument, but in my view, it would be more appropriately addressed at a later stage in the claim with the input of qualified medical experts.

> However, before the case reached that stage, petitioner requested a dismissal decision. When she did, the claim had been pending for ten

months. It had taken petitioner and her counsel significant time to obtain thousands of pages of medical records from providers in at least two states. She was still working to obtain the remaining medical records and a statement of completion. I had not provided my preliminary view of the claim (except for noting that any alleged injuries from the 2009 – 2010 HPV vaccines were time-barred). Respondent had not filed a [Vaccine] Rule 4(c) report or even a status report providing his view of the claim. Therefore, petitioner and her counsel appear to have made an independent decision to dismiss the claim, not because of any issues that had been clearly identified for them. In my experience, a petitioner sometimes decides to dismiss a claim for personal reasons such as improvement of his or her medical status, wanting to move on with his or her life, and the delays currently present in the Vaccine Program. The decision may also be based on prudent advice from counsel with experience in the Program.

Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *7 (internal citation omitted). The Special Master further noted that petitioner's motion for a dismissal decision "did not state that the evidence was insufficient to bring her claim." Id. The Special Master concluded: "In sum, I find that the medical records documenting a flare of an autoimmune disease shortly after administration of a covered vaccine provided reasonable basis for filing this petition and for pursuing it until the voluntary dismissal at an early stage." Id. (footnote omitted). The Special Master stated in a footnote that "[i]f the claim had proceeded, it may have lost reasonable basis at some point. However, that did not occur here. My determination is based on the limited filings and procedural history before me." Id. at *7 n.9.

Respondent timely filed a motion for review of the Special Master's decision on attorney's fees and costs on July 15, 2019 in the United States Court of Federal Claims.[7] In the instant case, respondent argues that "[t]he special master violated Simmons [v. Secretary of Health & Human Services, 875 F.3d 632 (Fed. Cir. 2017)] by improperly considering the conduct of petitioner's counsel in his reasonable basis analysis." Respondent further argues that "[e]ven if the special master had not improperly considered counsel's conduct in his reasonable basis analysis, the Decision still constitutes legal error because the special master did not ground his analysis in an evaluation of the objective record evidence," claiming that the Special Master's analysis "rested almost entirely on his subjective interpretation of the medical records and his

---

[7] This court notes the inconsistency in respondent's posture in this case and in other vaccine cases, such as McIntosh v. Secretary of Health & Human Services, 139 Fed. Cl. 238 (2018) and Dominguez v. Secretary of Health & Human Services, 136 Fed. Cl. 779 (2018), in which respondent declined to review petitioners' submitted requests for attorney's fees and costs, indicating it was the role of the special master, not the respondent. Both with respect to issues such as "reasonable basis" and the amount of attorney's fees and costs claimed by a petitioner, the Special Master is entitled to receive the input of the respondent represented by the United States Department of Justice on petitioner's claims for attorney's fees and costs, not just when the respondent chooses to do so.

speculation about what the evidence might have been if petitioner had decided to proceed with the case." The respondent has not challenged the amount of the fees and costs awarded, only whether there was a "reasonable basis" for the claim.

Petitioner filed a memorandum in opposition to respondent's motion for review on the issue of the Special Master's award of attorney's fees and costs and petitioner argues that after a thorough evaluation of several objective factors, the Special Master concluded that an award for attorney fees and costs "was appropriate in this case."[8] Petitioner states that "[b]ecause respondent has not shown that the Special Master erred, or that his factual findings and legal determinations were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, his decision should be affirmed."

# D I S C U S S I O N

When reviewing a special master's decision, the assigned Judge of the United States Court of Federal Claims may:

(A)  uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B)  set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa-12(e)(2). The legislative history of the Vaccine Act states: "The conferees have provided for a limited standard for appeal from the [special] master's decision and do not intend that this procedure be used frequently, but rather in those cases in which a truly arbitrary decision has been made." H.R. Rep. No. 101-386, at 517 (1989) (Conf. Rep.), reprinted in 1989 U.S.C.C.A.N. 3018, 3120.

Regarding the standard of review, in Markovich v. Secretary of Health and Human Services, the United States Court of Appeals for the Federal Circuit wrote, "[u]nder the Vaccine Act, the Court of Federal Claims reviews the Chief Special Master's decision to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' 42 U.S.C. § 300aa-12(e)(2)(B)." Markovich v. Sec'y of Health & Human Servs., 477 F.3d 1353, 1355-56 (Fed. Cir.), cert. denied, 552 U.S. 816 (2007); see also Deribeaux ex rel. Deribeaux v. Sec'y of Health & Human Servs., 717 F.3d at 1366 (The United States Court of Appeals for the Federal Circuit stated that "we 'perform[ ] the same task as the Court of Federal Claims and determine[ ] anew whether the special master's findings were arbitrary or capricious.'" (quoting Lampe v. Sec'y of Health & Human Servs., 219 F.3d 1357, 1360 (Fed. Cir. 2000))) (brackets in original); W.C. v. Sec'y

---

[8] Neither party challenges Special Master Gowen's "Decision on Entitlement."

of Health & Human Servs., 704 F.3d at 1355; Hibbard v. Sec'y of Health & Human Servs., 698 F.3d 1355, 1363 (Fed. Cir. 2012); Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1347 (Fed. Cir.) ("Under the Vaccine Act, we review a decision of the special master under the same standard as the Court of Federal Claims and determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 42 U.S.C. § 300aa-12(e)(2)(B))), reh'g and reh'g en banc denied (Fed. Cir. 2008); de Bazan v. Sec'y of Health & Human Servs., 539 F.3d at 1350; Althen v. Sec'y of Health & Human Servs., 418 F.3d 1274, 1277 (Fed. Cir. 2005); Dodd v. Sec'y of Health & Human Servs., 114 Fed. Cl. 43, 47 (2013); Taylor v. Sec'y of Health & Human Servs., 108 Fed. Cl. 807, 817 (2013). The arbitrary and capricious standard is "well understood to be the most deferential possible." Munn v. Sec'y of Health & Human Servs., 970 F.2d 863, 870 (Fed. Cir. 1992). "'Not in accordance with the law' refers to the application of the wrong legal standard, and the application of the law is reviewed de novo." Rodriguez v. Sec'y of Health & Human Servs., 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing Markovich v. Sec'y of Health & Human Servs., 477 F.3d 1353, 1356 (Fed. Cir. 2007)); see also Dougherty v. Sec'y of Health & Human Servs., 141 Fed. Cl. 223, 229 (2018) ("With respect to findings of fact, the special masters have broad discretion to weigh evidence and make factual determinations. As to questions of law, the legal rulings made by a special master in connection with a vaccine claim are reviewed de novo, under a 'not in accordance with the law' standard.").

Regarding attorneys' fees and costs, the Vaccine Act at 42 U.S.C. § 300aa-15(e)(1), provides:

> (1) In awarding compensation on a petition filed under section 300aa-11 of this title the special master or court shall also award as part of such compensation an amount to cover--

> (A) reasonable attorneys' fees, and

> (B) other costs, incurred in any proceeding on such petition. If the judgment of the United States Court of Federal Claims on such a petition does not award compensation, the special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought.

42 U.S.C. § 300aa-15(e)(1); see also Shaw v. Sec'y of Health & Human Servs., 609 F.3d 1372, 1375 (Fed. Cir. 2010).

"In Vaccine Act cases before this Court contesting a special master's determination of reasonable attorney's fees, the applicable standard of review is abuse of discretion." Scharfenberger v. Sec'y of Health & Human Servs., 124 Fed. Cl. 225, 231 (2015) (citing Hall v. Sec'y of Health & Human Servs., 640 F.3d 1351, 1356 (Fed. Cir. 2011) ), appeal dismissed (Fed. Cir. 2016); see also Dominguez v. Sec'y of Health & Human Servs., 136 Fed. Cl. at 782. As indicated by the Federal Circuit in Hall, "Section 300aa–15(e) states

that 'the special master or court shall also award as part of such compensation an amount to cover . . . reasonable attorneys' fees.' Thus, the statute leaves it to the special master's discretion to find what constitutes reasonable fees." Hall v. Sec'y of Health & Human Servs., 640 F.3d at 1356. As explained in Carter v. Secretary of Health & Human Services: "As an initial matter, the record before the Court shows that the special master correctly defined the reasonable basis standard under Section 15(e) of the Vaccine Act. The Court reviews the special master's legal determination regarding the meaning of the Vaccine Act's reasonable basis standard _de novo_." Carter v. Sec'y of Health & Human Servs., 132 Fed. Cl. 372, 379 (2017) "If the petition for compensation is denied, the special master 'may' award reasonable fees and costs if the petition was brought in good faith and upon a reasonable basis; the statute clearly gives him discretion over whether to make such an award." Saxton By & Through Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1520 (Fed. Cir. 1993) (citing Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 31 (1992)).

In the above captioned case, the respondent does not allege that the petition was not brought in good faith, only whether there was a reasonable basis for bringing the claim. Because respondent argues that "[t]he primary issue in this appeal is whether the special master correctly applied the law as stated in Simmons_,_" this court reviews the issue de novo. See Rodriguez v. Sec'y of Health and Human Servs., 632 F.3d at 1384.

The Vaccine Act, pursuant to which attorney's fees and costs can be awarded, is silent as to the definition of "reasonable basis." See 42 U.S.C. § 300aa-15(e)(1) (2012). The Court of Appeals for the Federal Circuit however, has explained, "good faith" and "reasonable basis" determinations are distinct, and that "only 'good faith' is subjective," while "'reasonable basis is objective.'" Simmons v. Sec'y of Health & Human Servs., 875 F.3d 632, 635 (Fed. Cir. 2017) (citing Chuisano v. United States, 116 Fed. Cl. at 289); see also Simmons v. Sec'y of Health & Human Servs., 128 Fed. Cl. 579, 582 (2016) (citing Chuisano v. United States, 116 Fed. Cl. at 289) ("Good faith and reasonable basis are 'two distinct facets' that must be judged separately."), aff'd, 875 F.3d 632 (Fed. Cir. 2017).

One special master described the review of whether there was a reasonable basis in order to award attorney's fees and costs as follows:

> A special master must award reasonable fees and costs to a petitioner who receives compensation under the Vaccine Act. 42 U.S.C. § 300aa-15(e)(1) (2012). Although not required to do so, the special master may also award reasonable fees and costs to an unsuccessful petitioner, so long as the petitioner (1) filed the petition in good faith and (2) had a reasonable basis for the claim. Id.

> Of note, the Vaccine Act does not compel the special master to make an award to every petitioner who meet these requirements; rather, Congress vested the special master with discretion and "plainly contemplat[ed] that not all petitioners would recover fees and costs." Chuisano v. United States, 116 Fed. Cl. 276, 286 (2014). To be sure, the special master's discretion is

13

tempered by the remedial nature of the Vaccine Act, which necessitates liberally construing its provisions to effectuate its ultimate goal: "to award compensation to vaccine-injured persons quickly, easily, and with certainty and generosity." Cloer v. Sec'y of HHS, 675 F.3d 1358, 1362 (Fed. Cir. 2012) (internal quotation marks omitted).

With regard to the good faith requirement, the Court of Federal Claims has observed that petitioners "are entitled to a presumption of good faith." Grice v. Sec'y of HHS, 36 Fed. Cl. 114, 121 (1996). In other words, when there is no "direct evidence of bad faith," the special master is justified in finding that Petitioner has met the good faith requirement. Id.

As to the existence of a reasonable basis for filing the claim, the Vaccine Act "grants to the special master maximum discretion in applying the standard." Silva v. Sec'y of HHS, 108 Fed. Cl. 401, 402 (2012). Functionally, "reasonable basis is an objective standard determined by the totality of the circumstances." Chuisano, 116 Fed. Cl. at 286. Although insusceptible to precise definition, a petitioner attempting to meet this standard faces a burden that "is something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." Id. at 287.

Mounts v. Sec'y of Health and Human Servs., No. 14-1219V, 2016 WL 4540344, at *5-6 (Fed. Cl. Spec. Mstr. July 27, 2016) (footnote omitted) (emphasis and alteration in original).

Reasonable basis may exist at the initial filing of a petition for compensation, but can dissipate as further evidence is introduced that undermines that basis. See Perreira v. Sec'y of Health & Human Servs., 33 F.3d at 1377.[9] For example, as indicated in Perreira v. Secretary of Health & Human Services, "once petitioners-appellants reviewed the expert opinion upon which their case depended, they no longer had a reasonable basis for claiming causation in-fact because the expert opinion was grounded in neither medical literature nor studies." Id. In Cottingham v. Secretary of Health & Human Services, a Judge of the United States Court of Federal Claims vacated a special master's decision denying attorney's fees and costs and remanded to the special master to "apply

---

[9] In Bilodeau v. Secretary of Health & Human Services, after filing a petition, the petitioners moved for a decision dismissing their petition, which the special master granted. See Bilodeau v. Sec'y of Health & Human Servs., No. 14-72V, 2017 WL 2417926, at *1 (Fed. Cl. Spec. Mstr. May 9, 2017). Subsequently, the petitioners moved for attorney's fees and costs. In response, the respondent argued that attorney's fees and costs were inappropriate "stating that '[t]he case lacked a reasonable basis at the time the petition was filed, and petitioners failed to obtain evidence to satisfy the reasonable basis requirement during the pendency of the case,' arguing that all attorneys' fees and costs should be denied." Id. The special master disagreed with respondent's characterization and awarded petitioners the full amount of attorney's fees and costs sought. See id. at *10-11.

a totality of the circumstances standard and reassess whether Petitioner's claim had a reasonable basis at the time the petition was filed and at intervals when additional evidence became available to Petitioner's counsel thereafter." Cottingham v. Sec'y of Health & Human Servs., 134 Fed. Cl. 567, 578 (2017).[10] It is appropriate for a special master to consider whether if a reasonable basis existed at the time the case was resolved when making a determination on the appropriateness of attorney's fees and costs. In the above captioned case, Ms. Harding had provided some, but perhaps not all, of the relevant medical records when the case was dismissed, and according to petitioner, she was still trying to obtain additional records. Special Master Gowen, therefore, had to determine if petitioner had a reasonable basis to bring her claims, although the record was as yet incomplete. The Special Master was obligated to rely on the medical records in the case, but his speculations about the future if the case had continued are not relevant to his decision on attorney's fees and costs and should not be given deference. Despite his musings and occasional speculation on what would have happened in the future, based on the medical records before him, it appears Special Master Gowen had a basis to conclude that the petition was filed in good faith and that there was a "reasonable basis" for petitioner to file the petition and to peruse her claims.

The respondent relies on Simmons, a decision issued by the United States Court of Appeals for the Federal Circuit in 2017, which considered whether there was reasonable basis for a petitioner's claim when petitioner's counsel filed a petition for compensation based on an occurrence of Guillain-Barré syndrome shortly before the statute of limitations in the case would have expired. See Simmons v. Sec'y of Health & Human Servs., 875 F.3d at 634. The petition in Simmons ultimately was dismissed for failure to prosecute by the special master, but the special master nevertheless awarded attorney's fees, finding as a reasonable basis that because the statute of limitation was set to expire, "'[t]o not file a petition . . . would be tantamount to an ethical violation.'" Id. (quoting Simmons v. Sec'y of Health & Human Servs., 2016 WL 2621070, at *3 (Fed. Cl. Spec. Mstr. Apr. 14, 2016), rev'd, 128 Fed. Cl. 579 (2016), aff'd, 875 F.3d 632 (Fed. Cir. 2017)) (alteration in original). The special master in Simmons noted that "Petitioner provided only the receipt of his vaccination, which occurred on October 26, 2010," and the special master focused on the fact that after an initial meeting, "[d]uring the next year and a half, Counsel attempted to contact Petitioner on at least 20 separate occasions via

---

[10] The court notes that this Cottingham decision, Cottingham v. Secretary of Health & Human Services, 134 Fed. Cl. 567, is one of three, distinct opinions issued by the United States Court of Federal Claims named Cottingham referenced in this Opinion. All three opinions relate to the same petitioner. The first two Cottingham decisions, Cottingham v. Secretary of Health & Human Services, 134 Fed. Cl. 567 and Cottingham v. Secretary of Health & Human Services, 139 Fed. Cl. 88 (2018) remanded the case back to the special master. The third and final Cottingham decision, Cottingham v. Secretary of Health & Human Services, 141 Fed. Cl. 85 (2018) denied the petitioner's motion for review. Cottingham v. Secretary of Health & Human Services, 141 Fed. Cl. 85, is currently on appeal to the United States Court of Appeals for the Federal Circuit. The court notes that the first Cottingham decision, Cottingham v. Secretary of Health & Human Services, 134 Fed. Cl. 567 was decided prior to the Federal Circuit's decision in Simmons.

email, telephone, and written letter, in order to follow up on their initial meeting and obtain Petitioner's medical records," but was only able to reach the <u>Simmons</u> petitioner on two occasions. <u>See</u> <u>id.</u> at *1. The special master in <u>Simmons</u> emphasized that "nine days before the statute of limitations deadline was due to expire, Petitioner called Counsel, asking 'to move forward' with his claim," but "[o]ver the next seven months, Counsel sought out Petitioner in myriad ways but was unable to contact him." <u>Id.</u> at *2.

The United States Court of Federal Claims in <u>Simmons</u> reversed the special master's decision, finding that the special master had erred in her reasonable basis analysis because "'[t]he fact that the statute of limitations was about to expire did not excuse counsel's obligation to show he had some basis for the claim beyond his conversation with the petitioner.'" <u>Simmons v. Sec'y of Health & Human Servs.</u>, 875 F.3d at 634 (quoting <u>Simmons v. Sec'y of Health & Human Servs.</u>, 128 Fed. Cl. 579, 584 (2016)).  The United States Court of Appeals for the Federal Circuit upheld the decision of the United States Court of Federal Claims, stating:

> The Vaccine Act provides that there must be a "reasonable basis <u>for the claim</u> for which the petition was brought" before the special master may exercise her discretion in awarding attorneys' fees. 42 U.S.C. § 300aa–15(e)(1) (emphasis added). Whether there is a looming statute of limitations deadline, however, has no bearing on whether there is a reasonable factual basis "for the claim" raised in the petition. That is an objective inquiry unrelated to counsel's conduct. Although an impending statute of limitations deadline may relate to whether "the petition was brought in good faith" by counsel, the deadline does not provide a reasonable basis for the merits of the petitioner's claim. <u>Id.</u>

<u>Simmons v. Sec'y of Health & Human Servs.</u>, 875 F.3d at 636 (emphasis in original). The Federal Circuit concluded:

> [C]ounsel may not use this impending statute of limitations deadline to establish a reasonable basis for Mr. Simmons's claim. <u>Because the special master only found that there was a reasonable basis for Mr. Simmons's claim because of the impending statute of limitations deadline</u>, we conclude that she abused her discretion by misapplying the law. Accordingly, we affirm the Claims Court's decision.

<u>Id.</u> (emphasis added). A difference between the current case and <u>Simmons</u> appears in the records before the two courts, as the <u>Simmons</u> case had virtually no documentation before the special master with only the receipt of his vaccination and nothing else having been submitted after the petition was filed. The record in the case currently before this court, in addition to the petition, includes over 2,000 pages of medical records submitted by petitioner, some of which appear to raise sufficient issues for Ms. Harding to have had a reasonable basis to file a vaccine petition with the United States Court of Federal Claims Office of Special Masters.

As indicated by a Judge of the United States Court of Federal Claims in Cottingham v. Secretary of Health & Human Services, 141 Fed. Cl. 85, "[t]he Court in Simmons was presented with a narrow issue -- whether an imminent statute of limitations deadline could be considered in assessing whether the petitioner's claim had a reasonable basis" to file the petition. See id. at 88. Moreover, the Cottingham court explained, "[t]hus, under Simmons, a special master may consider the evidence a petitioner provided, such as medical records and affidavits, in determining whether a reasonable basis for the claim exists." Id. As noted above, in the Simmons case, the Simmons petitioner only filed one document, proof of his vaccination and nothing else. Moreover, Mr. Simmons' attorney repeatedly tried to contact his client, on at least twenty occasions over a period of a year and a half, by email, telephone, and by letter. After counsel's initial contact with his client, petitioner's counsel could generally not reach his client after the petition was filed. Notably, unlike in Ms. Harding's case in which her petition was dismissed following her motion for a decision to dismiss her petition, the special master in Simmons dismissed the case for failure to prosecute. Finally, nowhere in Special Master Gowen's decision did he address the statute of limitations, which was the focus of the special master's decision in Simmons, except to note that the statute of limitations barred petitioner's earlier HPV vaccination was a cause in fact of her GPA. See Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *1.

More recently, a Judge of the United States Court of Federal Claims addressed the impact of the Federal Circuit's holding in Simmons regarding the reasonable basis analysis in Amankwaa v. Secretary of Health & Human Services, 138 Fed. Cl. 282 (2018). In Amankwaa, the court stated that prior to Simmons:

> [T]he Court of Federal Claims generally endorsed the use of a totality-of-the-circumstances analysis to determine whether there was a reasonable basis for a claim. See Cottingham v. Sec'y of HHS, 134 Fed. Cl. 567, 574 (2017). Specifically, special masters were expected to "consider the circumstances under which the petition is filed, any jurisdictional questions, the factual basis and medical support for the petition, and any other legal issues that may arise." Id. at 574–75; see also id. at 574 (observing that special masters have the "discretion to consider multiple potentially relevant circumstances—such as the novelty of the vaccine, scientific understanding of the vaccine and its potential consequences, the availability of experts and medical literature, and the time frame counsel has to investigate and prepare the claim—in assessing whether a Vaccine Act claim has a reasonable basis"). Further, "[t]his totality of the circumstances assessment [was to] take into account evidence available at the time a claim is filed and evidence that becomes available as the case progresses." Id. at 575.

Amankwaa v. Sec'y of Health & Human Servs., 138 Fed. Cl. at 287 (alteration in original). According to the Amankwaa court's reading of Simmons, "the Federal Circuit forbade, altogether, the consideration of statutory limitations deadlines-and all conduct of counsel-in determining whether there was a reasonable basis for a claim." Amankwaa v. Sec'y of Health & Human Servs., 138 Fed. Cl. at 289. The Amankwaa court further concluded that Simmons prohibited special masters from considering any subjective factors in

determining whether a claim had reasonable basis, but rather they must focus their analyses on objective factors, "such as the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." Id. (citing Cottingham v. Sec'y of Health & Human Servs, 134 Fed. Cl. at 574) (footnote omitted).

The United States Court of Federal Claims also addressed the impact of Simmons on a special master's reasonable basis analysis in Cottingham v. Secretary of Health & Human Services, 139 Fed. Cl. 88. The court in Cottingham v. Secretary of Health & Human Services, 139 Fed. Cl. 88, held that, in light of the issuance of Simmons while a petitioner's case was pending before the special master on remand, the special master "shall, consistent with Simmons, analyze whether the evidence alone was sufficient for finding a reasonable basis for Petitioner's claim, without considering the conduct of counsel or the impending statute of limitations." Cottingham v. Sec'y of Health & Human Servs, 139 Fed. Cl. at 94.

In his decision on attorney's fees and costs in the case currently before the court, Special Master Gowen, citing to Simmons and Amankwaa stated:

> "[R]easonable basis" is an objective consideration of the totality of the circumstances except for the statute of limitations or any directly related conduct by petitioner's counsel. Simmons, 875 F.3d at 635; Chuisano, 116 Fed. Cl. at 289. However, this evaluation may include various objective factors such as "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation." Amankwaa v. Sec'y of Health & Human Servs., 138 Fed. Cl. 282, 289-90 (2018).

Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *2.

The respondent, in Ms. Harding's case, however, argues that Special Master Gowen misapplied the legal standard for "reasonable basis" set forth by the Federal Circuit in Simmons v. Secretary of Health & Human Services. Respondent asserts that the Special Master "found the procedural history, and in particular the decision by petitioner and her counsel to dismiss the claim, controlling." Respondent further argues that:

> [N]owhere in Simmons did the Federal Circuit endorse a "totality of the circumstances" test for evaluating reasonable basis. Rather, Simmons makes clear that a special master's reasonable basis analysis must focus solely on whether there is objective support in the record for the claim set forth in the petition. 875 F.3d at 635-36. The special master's formulation of the holding in Simmons is therefore legally incorrect.

Respondent also argues that because "the conduct of petitioner and her counsel (in bringing and subsequently dismissing her petition) was plainly critical to the special master's reasonable basis analysis," the decision "contains clear error, and must be reversed." Petitioner's responds:

> [T]he Special Master did not consider attorney conduct in ruling that there was a reasonable basis to bring petitioner's claim. Indeed, respondent glances over 6-pages of the Special Master's analysis of the medical record to fabricate a story that somehow the focus of his analysis was on attorney conduct and not the claim itself.

(footnote omitted). Petitioner's counsel maintains, however, that because the Special Master had "(1) 'considered the relevant evidence of record,' (2) 'drawn plausible inferences,' and (3) stated, 'a rational basis for the decision,' therefore there is no reversible error. Hines [v. Sec'y of Health & Human Servs.], 940 F.2d 1518, 1528."

Respondent further argues that this court also could find legal error in the Special Master's decision because:

> [T]he special master did not ground his analysis in an evaluation of the objective record evidence. To the contrary, his analysis rested almost entirely on his subjective interpretation of the medical records and his speculation about what the evidence might have been if petitioner had decided to proceed with the case.

It is unfortunate that the Special Master included speculation as to possible "what ifs" a number of times in his decision, most notably when he mused, "[i]t is entirely possible that if Dr. Schindler was consulted, he would have expressed concern about the HPV vaccines being administered during this time period, as he did about the nasal surgery." Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *6.[11] Nonetheless, the Special Master's review of the medical history in the record provides a basis for his award of attorney's fees and costs to the petitioner. The Special Master drew specifically from the petition and the medical records, the objective factors under the Federal Circuit's guidance in Simmons v. Secretary of Health & Human Services, to conclude that a flare of petitioner's GPA after administration of the HPV vaccination provided the reasonable basis sufficient to grant petitioner's request for attorney's fees and costs.

---

[11] In his decision on attorney's fees and costs, the Special Master also speculated as to why the petitioner may have had two separate series of the HPV vaccination. Special Master Gowen stated:

> The medical records from this visit do not reflect the petitioner previously completed a three-dose HPV vaccine series back in 2011. It is possible that petitioner needed a repeat course of HPV vaccine because her treatment for GPA, including chemotherapy drugs, wiped out her immune system. An alternative explanation could be that the medical provider giving the HPV vaccines in 2014 may not have been aware of the previous HPV vaccines administered at a different medical practice back in 2011. At any rate, it appears that in 2014, the gynecologist was aware of petitioner's history of GPA but did not see any contraindication for administering the HPV vaccine.

Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *5.

Finally, respondent states that the Special Master made a legal error when he concluded that "'a flare of an autoimmune disease shortly after administration of a covered vaccine,'" was sufficient to establish reasonable basis in this case. Respondent states:

> While that evidence might have established a reasonable basis if petitioner were alleging a Table injury – in which case causation could be presumed based solely on proof of onset of the injury within the Table time period – it does not support a reasonable basis finding in a causation-in-fact case like this one. Indeed, the Federal Circuit has repeatedly held that timing alone is insufficient to meet petitioner's burden of proof in causation-in-fact cases. See, e.g., Moberly v. HHS, 592 F.3d 1315, 1323 (Fed. Cir. 2010); W.C. v. HHS, 704 F.3d 1352, 1356 (Fed. Cir. 2013); see also Chuisano, 116 Fed. Cl. at 287 ("[t]emporal proximity is necessary, but not sufficient" to establish reasonable basis).

(alteration in original). Respondent asserts that "neither petitioner nor the special master has identified any objective evidence in the record addressing the critical issue of causation," and argues that "petitioner's medical records do not document a significant aggravation of petitioner's GPA in the time periods after her HPV vaccinations, but rather only a waxing and waning of symptoms likely associated with fluctuations in medications." Respondent contends that it was arbitrary and capricious for the special master to base his reasonable basis analysis of petitioner's aggravation claim on "his own subjective speculation, which was not supported by the medical records or any substantiating evidence from an expert or treating physician." Respondent concludes that, "[i]ndeed, the special master's findings appear to serve only as a pretext for his primary reason for finding reasonable basis – i.e., his desire to reward petitioner and her counsel for the decision to dismiss the claim 'at an early stage.'"

Petitioner's counsel responds, however, that:

> The Special Master's review of the medical facts of this case in addition to the fact that claims that GPA was significantly aggravated by vaccination were successfully litigated in this program in the past, provided more than enough objective factors necessary to award attorney fees and costs in this case.

(footnotes omitted).

This court agrees that petitioner's claim does not fall within the Vaccine Injury Table, and, therefore, is considered a non-Table claim for purposes of recovery under 42 U.S.C. §§ 300aa–11(c)(1), –13(a)(1). See Vaccine Injury Table, 42 C.F.R. § 100.3(a) (2019). In order to recover under the Vaccine Act, a petitioner "must show, by a preponderance of the evidence, "that the injury or death at issue was caused by a vaccine." Milik v. Sec'y of Health & Human Servs., 822 F.3d 1367, 1379 (Fed. Cir. 2016); (quoting Broekelschen v. Sec'y of Health & Human Servs., 618 F.3d 1339, 1341 (Fed. Cir. 2010) (citing 42 U.S.C. §§ 300aa–11(c)(1), –13(a)(1)); see also W.C. v. Sec'y of Health & Human Servs., 704 F.3d 1352, 1355-56 (Fed. Cir. 2013) ("The Vaccine Act

created the National Vaccine Injury Compensation Program, which allows certain petitioners to be compensated upon showing, among other things, that a person 'sustained, or had significantly aggravated' a vaccine-related 'illness, disability, injury, or condition.'" (quoting 42 U.S.C. § 300aa–11(c)(1)(C))); Lombardi v. Sec'y of Health & Human Servs., 656 F.3d 1343, 1350 (Fed. Cir. 2011) ("A petitioner seeking compensation under the Vaccine Act must prove by a preponderance of the evidence that the injury or death at issue was caused by a vaccine."); see also Shapiro v. Sec'y of Health & Human Servs., 105 Fed. Cl. 353, 358 (2012), aff'd, 503 F. App'x 952 (Fed. Cir. 2013); Jarvis v. Sec'y of Health & Human Servs., 99 Fed. Cl. 47, 54 (2011).

As United States Court of Appeals for the Federal Circuit explained:

> A petitioner can establish causation in one of two ways. Id. [Broekelschen v. Sec'y of Health & Human Servs., 618 F.3d at 1341] If the petitioner shows that he or she received a vaccination listed on the Vaccine Injury Table, 42 U.S.C. § 300aa–14, and suffered an injury listed on that table within a statutorily prescribed time period, then the Act presumes the vaccination caused the injury. Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1374 (Fed. Cir. 2009). Where, as here, the injury is not on the Vaccine Injury Table, the petitioner may seek compensation by proving causation-in-fact.

Milik v. Sec'y of Health & Human Servs., 822 F.3d at 1379 (citing Andreu v. Sec'y of Health & Human Servs., 569 F.3d at 1374); see also Grant v. Sec'y of Health & Human Servs., 956 F.2d 1144, 1147-48 (Fed. Cir. 1992). The Federal Circuit has held that causation-in-fact in the Vaccine Act context is the same as the "legal cause" in the general torts context. See Shyface v. Sec'y of Health & Human Servs., 165 F.3d 1344, 1352 (Fed. Cir. 1999). Therefore, drawing from the Restatement (Second) of Torts, the vaccine is a cause-in-fact when it is "a substantial factor in bringing about the harm." de Bazan v. Sec'y of Health & Human Servs., 539 F.3d 1347, 1351 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2008) (quoting the Restatement (Second) of Torts § 431(a)); see also Deribeaux ex rel. Deribeaux v. Sec'y of Health & Human Servs., 717 F.3d 1363, 1367 (Fed. Cir.) reh'g and reh'g en banc denied (Fed. Cir. 2013) ("To prove causation, a petitioner must show that the vaccine was 'not only a but-for cause of the injury but also a substantial factor in bringing about the injury.'" (quoting Shyface v. Sec'y of Health & Human Servs., 165 F.3d at 1352–53)). A "substantial factor" standard requires a greater showing than 'but for' causation." de Bazan v. Sec'y of Health & Human Servs., 539 F.3d at 1351 (quoting Shyface v. Sec'y of Health & Human Servs., 165 F.3d at 1352). "However, the petitioner need not show that the vaccine was the sole or predominant cause of her injury, just that it was a substantial factor." Id. (citing Walther v. Sec'y of Health & Human Servs., 485 F.3d 1146, 1150 (Fed. Cir. 2007)).

Under the off-Table theory of recovery, a petitioner is entitled to compensation if he or she can demonstrate, by a preponderance of the evidence, see 42 U.S.C. § 300aa-13(a)(1)(A), that the recipient of the vaccine sustained, or had significantly aggravated, an illness, disability, injury, or condition not set forth in the Vaccine Injury Table, but which

was caused by a vaccine that is listed on the Vaccine Injury Table. See 42 U.S.C. § 300aa-11(c)(1)(C)(ii)(I); see also LaLonde v. Sec'y of Health & Human Servs., 746 F.3d 1334, 1339 (Fed. Cir. 2014); W.C. v. Sec'y of Health & Human Servs., 704 F.3d at 1356 ("Nonetheless, the petitioner must do more than demonstrate a 'plausible' or 'possible' causal link between the vaccination and the injury; he must prove his case by a preponderance of the evidence." (quoting Moberly ex rel. Moberly v. Sec'y of Health & Human Servs., 592 F.3d at 1322)); Althen v. Sec'y of Health & Human Servs., 418 F.3d at 1278; Hines on Behalf of Sevier v. Sec'y of Dep't of Health & Human Servs., 940 F.2d at 1525. While scientific certainty is not required, the Special Master "is entitled to require some indicia of reliability to support the assertion of the expert witness." Moberly ex rel. Moberly ex rel. v. Sec'y of Health & Human Servs., 592 F.3d at 1324; see also Hazlehurst v. Sec'y of Health & Human Servs., 88 Fed. Cl. 473, 439 (2009), aff'd, 604 F.3d 1343 (Fed. Cir. 2010) (quoting Andreu ex rel. Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009)). Therefore, to receive compensation for an aggravation claim petitioner would have to prove that the HPV vaccination caused aggravation of her GPA. The burden, however, for establishing reasonable basis in order to recover attorney's fees is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." Chuisano v. United States, 116 Fed. Cl. at 287 (2014).

In Hines on Behalf of Sevier v. Secretary of Health & Human Services, the United States Court of Appeals for the Federal Circuit addressed the correct standard of review when the issue before the special master was if the evidence submitted by petitioner was sufficient to conclude that the vaccine had caused the injury. See Hines on Behalf of Sevier v. Sec'y of Health & Human Servs., 940 F.2d 1518, 1527 (Fed. Cir. 1991). The Federal Circuit held that if a special master has 1) considered the relevant evidence in the record, 2) drawn plausible inferences, and 3) articulated a rational basis for the decision, then "reversible error will be extremely difficult to demonstrate" under the arbitrary and capricious standard of review. See id. at 1528.

In Ms. Harding's case, Special Master Gowen's decision suggests that he reviewed over 2,000 pages of medical records submitted by petitioner in order to conduct his rational basis analysis. The Special Master determined that "the medical records documenting a flare of an autoimmune disease shortly after administration of a covered vaccine provided reasonable basis for filing this petition." In a footnote to his decision, the Special Master noted that in drafting the section of the decision for the period between the onset of petitioner's GPA and her second series of HPV vaccines, he relied on respondent's response to the motion for attorney's fees and costs, "but the Court has independently reviewed the medical records and added additional details." Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *4 n.7. The Special Master's decision includes numerous citations to petitioner's medical records, in the exhibits petitioner filed with the court, demonstrating his review and familiarity with the medical records before issuing his decision. For example, the Special Master's decision states in part:

On July 7, 2014, Dr. Schindler recorded that petitioner had worsened breathing and hearing. He increased prednisone to 40 mg/ day for 2 weeks, then decreased to 30 mg/ day for one month. Pet. Ex. 1 at 16-20. On July 15, 2014, Dr. Schindler performed another surgical dilation of her airway. Pet. Ex. 1 at 98-103. It was noted at this time that her lungs were affected. Pet. Ex. 10 at 298. She was doing better after this on Cytoxan and weaning prednisone doses. Id. at 361, 447, 516.

Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *5. Special Master Gowen also quoted directly from the petitioner's exhibits in his decision, sometimes in some detail. For example:

Two days after receiving the first HPV vaccine at issue in this claim, on October 30, 2014, petitioner presented to her surgeon Dr. Schindler for a follow-up. She was taking prednisone at 17.5 mg daily as well as methotrexate. She reported feeling "good" and had no complaints of shortness of breath on exertion, noisy breathing, or upper respiratory infection. She planned to undergo a rhinoplasty to correct the saddle nose deformity in December 2014 (in approximately two months' time). After performing a physical evaluation, Dr. Schindler assessed that petitioner's "previously diagnosed granulomatosis with polyangiitis (GPA) does not appear at this time." Pet. Ex. 1 at 44-45. His assessment continued:

> I have grave concerns about her undergoing rhinoplasty in the next couple of months, however. She has not demonstrated adequacy of her immunosuppression off prednisone yet and I fear that surgery to correct her saddle nose deformity and septal perforation could "reawaken" her disease. I would like to see her stably managed on methotrexate and quiescent for several months before surgery on a known site of activity for her. I fear that withdrawal of her immunosuppression around surgery for more than a brief period could result in reactivation of the GPA and loss of the reconstruction. We talked about this for a while and I promised that I would review my thoughts with Dr. Wang and Dr. Garg. My thoughts for her nasal surgery would be more like 6 months from now with demonstrated quiescence on methotrexate and off oral steroids. She was extremely disappointed by this, but I really think that there is one good opportunity to the nasal reconstruction and I have seen this operation fail in patients with continued disease activity. She will need very careful management of her immunosuppression through surgery to help prevent flare. I do believe that she can continue her inhaled corticosteroid for the subglottic and bronchial disease and topical nasal steroid may be useful around the time of nasal surgery.

Id. at 45. Dr. Schindler increased prednisone to 27.5 mg/ day for 2 weeks, then down to 25 mg/ day for 2 weeks. He planned to see petitioner again in three months or sooner if symptoms worsened. Id. at 45-46.

Id.

After summarizing his findings from petitioner's medical records, Special Master Gowen stated:

> The medical records from late September and October 2014 do not expressly say that petitioner was in "remission" before receiving the HPV vaccines at issue in the significant aggravation claim. However, those records do suggest that her condition was improving and approaching quiescience [sic]. Additionally, the medical records reflect that within 30 days after petitioner received the first HPV vaccine at issue, petitioner did experience of [sic] GPA. Indeed, within 45 days after the HPV vaccine, Dr. Schindler, the doctor managing her GPA, confirmed the flare and recorded that her condition was "inadequately controlled."
>
> I find particularly persuasive Dr. Schindler's concern about activation of petitioner's GPA, an autoimmune condition, during the tapering down of prednisone. Dr. Schindler specifically advised against nasal surgery which petitioner wanted to undergo. He does not mention the advisability of HPV or any other vaccines during the tapering down of prednisone. He may not have been asked about the HPV vaccines or aware that petitioner received them (from a different medical provider). It is entirely possible that if Dr. Schindler was consulted, he would have expressed concern about the HPV vaccines being administered during this time period, as he did about the nasal surgery.

Id. at *6.

Respondent characterizes the Special Master's statements as the Special Master's "subjective interpretation of the medical records." Notwithstanding the pure speculation in the last sentence quoted immediately above, the medical records provided by petitioner from her visit with Dr. Schindler on September 28, 2014 state that Dr. Schindler saw "no signs of active nasal or subglottic granulomatosis with polyangiitis (GPA)," between the first and second series of the HPV vaccination petitioner received. As indicated in petitioner's exhibits submitted to Special Master Gowen, petitioner received the first shot in the second series of HPV vaccinations on October 28, 2014, and the physician who administered the shot to petitioner noted no signs of respiratory distress or abnormalities in petitioner upon physical examination that day. See id. at *5. Petitioner received the second shot in the series of HPV vaccinations at issue on November 25, 2014 and the next day presented to her primary care practice complaining of stomach discomfort, urine smelling of ammonia, decreased appetite, loose stools, fatigue, and dry skin for two weeks. See id. at *6. On December 2, 2014, petitioner's

primary care physician Dr. Rampton assessed petitioner as having "Wegener's granulomatosis" with a note about tapering steroids, as well as headache, depression, and anxiety, although he attributed it to "[s]teroid withdrawal." On December 15, 2014, Dr. Schindler assessed petitioner as having inadequately controlled GPA.

This court finds that the Special Master's evaluation of reasonable basis is consistent with the Federal Circuit's holding in Simmons. Although the Special Master referred to the totality of the circumstances when describing the reasonable basis standard in his decision on attorney's fees and costs, indicating, "[i]n contrast to good faith, 'reasonable basis' is an objective consideration of the totality of the circumstances except for the statute of limitations or any directly related conduct by petitioner's counsel." Simmons, 875 F.3d at 635; Chuisano, 116 Fed. Cl. at 289," Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *2, Special Master Gowen's decision focused on objective considerations in the record, such as petitioner's more that 2,000 pages of medical records.

Moreover, the Special Master specifically acknowledged the holding of the United States Court of Federal Claims in Amankwaa, that the evaluation of reasonable basis should be based on various objective factors. Although Special Master Gowen discussed petitioner's and her counsel's decision to request a dismissal of her claim, as well as extrapolated from his prior experience as a special master in the Vaccine Program as to the reasons why petitioner and petitioner's counsel may have sought a dismissal, his speculative comments were not the primary basis to award attorney's fees and costs. In his decision, the Special Master plainly states: "I find that the medical records documenting a flare of an autoimmune disease shortly after administration of a covered vaccine provided reasonable basis for filing this petition and for pursuing it until the voluntary dismissal at an early stage." Harding v. Sec'y of Health & Human Servs., 2019 WL 3215974, at *7 (footnote omitted). The Special Master's decision focused far more on the review of over 2,000 pages of medical records, including descriptions of petitioner's GPA symptoms and HPV vaccinations, than on court procedures or the actions of petitioner's attorney when or after the petition was filed and when the fees were sought.

This court finds that the objective evidence in the record provided an adequate basis upon which Special Master Gowen could arrive at the determination that petitioner's medical records "suggest that her condition was improving and approaching quiescience. Additionally, the medical records reflect that within 30 days after petitioner received the first HPV vaccine at issue, petitioner did experience of GPA. Indeed, within 45 days after the HPV vaccine, Dr. Schindler, the doctor managing her GPA, confirmed the flare and recorded that her condition was 'inadequately controlled.'" It is correct that the Special Master did not cite to evidence in the medical records that specifically mention the HPV vaccination as the cause or significant contributing factor to the aggravation of petitioner's GPA. The Special Master, however, could, and did, find a "reasonable basis" to award attorney's fees and costs, in the medical records submitted to the court at the time the petition was filed and in subsequently submitted medical records prior to petitioner asking to dismiss the claims in order to try to demonstrate that the HPV vaccination was the cause or significant contributing factor of the aggravation of petitioner's GPA.

In his decision, the Special Master also recognized that there have been previous awards for compensation in cases raising GPA based claims, although none of the decisions cited included an HPV vaccination, at issue in this case. See id. at *3 (citing Rosa v. Sec'y of Health & Human Servs., No. 14-886V, 2017 WL 1401365 (Fed. Cl. Spec. Mstr. Mar. 24, 2017); Purgason v. Sec'y of Health & Human Servs., No. 12-465V, 2016 WL 1627575 (Fed. Cl. Spec. Mstr. April 4, 2016); Fields v. Sec'y of Health & Human Servs., No. 02-311V, 2008 WL 222241 (Fed. Cl. Spec. Mstr. May 14, 2008); Schrum v. Sec'y of Health & Human Servs., No. 04-210V, 2006 WL 1073012 (Fed. Cl. Spec. Mstr. Mar. 31, 2006)).

Respondent argues that "without affirmative evidence from an expert or treating physician that the HPV vaccine actually caused or significantly aggravated petitioner's GPA, her claim had no feasibility of success," and, therefore, the Special Master could not find a "reasonable basis." Respondent appears to conflate the evidentiary standard required for an award of compensation for a non-Table injury with the standard required to prove "reasonable basis" for an award of attorney's fees and costs. Moreover, the statute does not draw a distinction between Table and non-Table injuries when providing for awards of attorney's fees and costs before a case goes through complete evidence presentation. See 42 U.S.C. § 300aa-15(e)(1). While Special Master Gowen notes that he likely would have asked petitioner to seek an expert opinion if the case had proceeded, petitioner had not engaged an expert at the time she sought to dismiss her petition, nor had she obtained all of the medical records she indicated that she was trying to obtain to file with the court. The absence of an expert opinion in support of her case at the time her petition was dismissed does not preclude an award of attorney's fees and costs.

As indicated above, the Federal Circuit in Hines on Behalf of Sevier v. Secretary of Health & Human Services, held that if a special master has 1) considered the relevant evidence in the record, 2) drawn plausible inferences, and 3) articulated a rational basis for the decision, then "reversible error will be extremely difficult to demonstrate" under the arbitrary and capricious standard of review. Hines on Behalf of Sevier v. Sec'y of Health & Human Servs., 940 F.2d at 1528. The Special Master did not act arbitrarily or capriciously in determining that petitioner had a reasonable basis for filing her claim based on the record to date before the Special Master at the time petitioner requested dismissal of her case. Although indicating he was considering "reasonable basis" to be an objective consideration of the totality of the circumstances, Special Master Gowen was able to rely on the objective medical records to reach his decision on attorney's fees and costs.

Respondent also offered policy arguments as to why it believes no fees or costs should be awarded in this case. Respondent argues that "special masters already grant a generous concession to the petitioners' bar when they permit petitioners' counsel to file deficient petitions and supplement them post-filing in an attempt to establish, at a minimum, a reasonable basis for the claim." Respondent maintains that according to the billing records provided by petitioner's counsel in this case, counsel was first contacted by petitioner in April 2015 and, therefore, had sufficient time to fully investigate petitioner's claim with the United States Court of Federal Claims Office of Special Masters before filing in October 2017. Respondent states:

26

The special master's Decision in this case reflects his apparent view that Congress intended for petitioners' counsel to be reimbursed for their time and costs incurred in connection with investigating essentially every case filed under the Act, even when evidence to support critical elements of the claim ultimately is not produced. Stated otherwise, the special master appears to believe that petitioners' counsel should always be paid for investigating their clients' claims, even when a reasonable basis for the claim ultimately is not established, so long as counsel dismisses the claim promptly upon determining that the claim has no merit.

Not only is such an approach inconsistent with the plain language of Sections 11(c) and 15(e)(1), it inevitably results in the filing of Vaccine Act cases that have no possibility of success on their merits. If the special master's Decision is upheld, it will only encourage petitioners' attorneys to "game the system" by waiting until after a petition is filed to determine whether the claim can be supported with objective evidence, so that they can be reimbursed for their investigation into the claim. At a time when the resources of the Court and respondent are being stretched to their limits due to the extraordinary number of Vaccine Act petitions being filed, it does not make sense from either a policy or practical standpoint to compensate counsel for bringing cases that have no chance of success. In fact, by including the reasonable basis requirement in Section 15(e) of the Act, Congress almost certainly intended the opposite result.

In response to respondent's policy arguments, petitioner's counsel states:

The law of this Circuit is clear, an expert report is not a requirement to establish reasonable basis for attorney fees and costs. There must be some way of obtaining an award of attorney fees and costs when no expert report is proffered. The respondent argues that there must be some other direct evidence of vaccine causation, such as a causal connection made by the treating physician, in the medical records in order to find reasonable basis. Not only is this proposed requirement not the law of this Circuit, but it goes against the very nature of these medically complicated cases . . . .

In this case, there is no question that GPA is a rare condition that has been compensated by the VICP [Vaccine Injury Compensation Program]. The Special Master analyzed the record determining that there was evidence that Ms. Harding suffered a flare of the condition shortly after receiving a covered vaccine. That should be enough to establish reasonable basis. If this Court decides that direct evidence of vaccine causation is required for attorney fees and costs, then this program will face an attorney crisis in addition to the petitioner expert one that we are now experiencing.

(footnote omitted).

The Court of Appeals for the Federal Circuit summarized the purpose of the National Vaccine Injury Compensation Program in Cloer v. Secretary of Health & Human Services, stating:

The overarching purpose of the Vaccine Act and the National Childhood Vaccine Injury Compensation Program it created is to award compensation "to vaccine-injured persons quickly, easily, and with certainty and generosity." H.R. Rep. No. 99-908, at 3. Remedial legislation like the Vaccine Act should be construed in a manner that effectuates its underlying spirit and purpose. See Atchison, Topeka, & Santa Fe Ry. Co. v. Buell, 480 U.S. 557, 561-62, 107 S. Ct. 1410, 94 L. Ed. 2d 563 (1987). Our interpretation of the statute fulfills congressional intent and the Act's legislative purpose. Congress acknowledged that "[l]awsuits and settlement negotiations can take months and even years to complete. Transaction costs—including attorneys' fees and court payments—are high. And in the end, no recovery may be available. Yet futures have been destroyed and mounting expenses must be met." H.R. Rep. No. 99-908, at 6. Congress recognized that having to shoulder attorneys' fees could deter victims of vaccine-related injuries from seeking redress.

Cloer v. Sec'y of Health & Human Servs., 675 F.3d 1358, 1362 (Fed. Cir. 2012), aff'd, 569 U.S. 369 (2013). As described above, regarding attorney's fees and costs, the Vaccine Act at 42 U.S.C. § 300aa-15(e)(1), specifically provides:

(1) In awarding compensation on a petition filed under section 300aa-11 of this title the special master or court shall also award as part of such compensation an amount to cover--

(A) reasonable attorneys' fees, and

(B) other costs, incurred in any proceeding on such petition. If the judgment of the United States Court of Federal Claims on such a petition does not award compensation, the special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought.

42 U.S.C. § 300aa-15(e)(1).

It has been acknowledged by the Court of Appeals for the Federal Circuit that Congress did not intend that all claimants be eligible for an award of attorney's fees whether or not they are eligible to receive compensation. See Perreira v. Sec'y of Health & Human Servs., 33 F.3d at 1376 (finding that the funds available under the statute are limited). As explained by the United States Supreme Court, however, "[a]ttorney's fees are provided, not only for successful cases, but even for unsuccessful claims that are not frivolous. These awards are paid out of a fund created by an excise tax on each vaccine dose."[12] Bruesewitz v. Wyeth LLC, 562 U.S. 223, 229 (2011) (footnotes omitted). The

---

[12] The Supreme Court explained that:

respondent does not allege, nor does this court find, that petitioner's claims were frivolous. Moreover, as indicated by a Judge of the United States Court of Federal Claims, the purpose of the fee-shifting provision is to "ensure that vaccine-injury claimants will have readily available a competent bar to prosecute their claims under the [Vaccine] Act." Scalon v. Sec'y of Health & Human Servs., 116 Fed. Cl. 629, 634 (2014) (quoting Saunders v. Sec'y of Health & Human Servs., 25 F.3d 1031, 1035 (Fed. Cir. 1994)) (alternation in original).

Taking into account various objective factors "is consistent with the underlying spirit and purpose of the Vaccine Act, and strikes the right balance between an award of fees to counsel who have represented unsuccessful claimants and the statutorily expressed congressional intent to impose some limitations on fee awards." Chuisano v. United States, 116 Fed. Cl. at 290. Special Master Gowen based his decision on the objective medical records provided by petitioner when deciding to award attorney's fees and costs to petitioner, even though her claim was unsuccessful and petitioner asked to have her petition dismissed before fully litigating it. The purpose of the Vaccine Program is not to discourage the sincere petitioners from bringing claims, even if they are ultimately unsuccessful. The Vaccine Program also does not seek to dissuade attorneys from representative petitioners who have a reasonable basis and chance of success when filing a claim. A special master can award attorney's fees and costs even to an unsuccessful petitioner, provided the claim was brought in good faith and petitioner had a reasonable basis for filing the claim. See 42 U.S.C. § 300aa-15(e)(1). The Special Master did so in this case.

## CONCLUSION

Upon review of the record before the court, Special Master Gowen's June 18, 2019 decision to grant petitioner attorney's fees and costs of $17,366.96 was not an abuse of discretion, nor was it arbitrary or capricious. Therefore, respondent's motion for review is hereby **DENIED**.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

The *quid pro quo* for this, designed to stabilize the vaccine market, was the provision of significant tort-liability protections for vaccine manufacturers. The Act requires claimants to seek relief through the compensation program before filing suit for more than $1,000. Manufacturers are generally immunized from liability for failure to warn if they have complied with all regulatory requirements (including but not limited to warning requirements) and have given the warning either to the claimant or the claimant's physician.

Bruesewitz v. Wyeth LLC, 562 U.S. at 229 (emphasis in original; footnotes omitted).